THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FREDDIE BROWN, Defendant-Appellant.

Fifth District   No. 5—92—0356

Opinion filed September 23, 1993.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Diane L. Campbell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial defendant, Freddie Brown, was found guilty of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) and two counts of attempted first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 8—4(a)). Defendant was sentenced to 50 years in the Department of Corrections on the murder conviction and 20 years in the Department of Corrections on each of the attempted murder convictions. The 20-year prison terms are to run concurrently to each other and consecutively to the murder conviction. In this cause, defendant raises two issues: (1) whether the trial court erred in refusing to give defendant's tendered jury instructions on the offense of aggravated battery, and (2) whether the trial court abused its discretion in sentencing defendant. We affirm.

I

The offenses charged herein occurred on the afternoon of May 26, 1991, at the home of Arthur and Betty Howard. The Howards' daughter, Anita, defendant's ex-wife, was an officer in the Air Force and was home on leave to attend a cotillion with her daughter, Tantrece. Defendant was Tantrece's father. Defendant and Anita were married in 1972 but divorced in the early 1980's. Anita obtained custody of Tantrece; however, Tantrece lived primarily with her grandparents, Arthur and Betty Howard, because Anita was often required to move due to her career in the Air Force. Over the years, Tantrece had not seen a lot of her father, but she denied that her grandparents turned her against him or refused to allow her to associate with him.

Defendant could not accept his divorce from Anita and continually harassed the Howard family. Doris Telford, employed by the Department of Children and Family Services (the Department), testified that on May 18, 1990, a man who identified himself as defendant and with whom she had previously spoken about his daughter, ex-wife, and in-

laws telephoned her. At that time defendant stated: "I have a weapon. I'm contacting your agency in order to keep from killing someone, from stalking them."

In 1982, Anita met Lavester Cook, who was also in the Air Force. The two were married approximately three years when they came to St. Louis so that Anita could attend the cotillion with her daughter. Anita and Lavester arrived in East St. Louis on May 25, 1991, and settled in with Anita's parents. The car the Cooks were driving upon arrival bore Texas license plates. The Cooks were then stationed in Texas. Tags on the car also indicated that the vehicle belonged to a member of the armed forces. An article announcing the cotillion appeared in a local newspaper approximately one week prior to the event. The article stated that Tantrece would be attending the ball with her mother, Anita, and included both Tantrece's and Anita's photographs.

On the afternoon of May 26, 1991, the Cook car was parked in front of the Howards' residence. Lavester was not at the Howards' residence in the afternoon. He left with Anita's brother, Roderick, in Roderick's car. While Lavester was gone, defendant came to the Howards' home. Anita answered the door. Anita called to Tantrece to let her know her father arrived. Tantrece went to the door and spoke with defendant for approximately three minutes. Without being invited, defendant came into the house and asked, "Where is he? Where is he?" Tantrece believed that defendant was asking about Lavester. For the next few minutes, Tantrece and Anita tried to get defendant to leave. Anita argued with defendant. Betty came downstairs and asked defendant to leave, but he would not. Tantrece saw defendant pull a handgun from his pocket. Tantrece told Betty defendant had a gun. Tantrece then left the home. Betty called upstairs to her husband and told him that defendant had a gun. Arthur then started downstairs. At that point, defendant shot Betty two times, once in each leg. Defendant stated, "I'm going to kill all you damn mother fuckers." Betty then fled from defendant and ran upstairs. Defendant and Anita remained in the kitchen. Betty heard defendant say, "Come here, Anita, I'm going to kill you."

Arthur Howard remembered coming downstairs and seeing defendant come through the door. At that time, Howard says, defendant stated, "I'm going to kill all you fuckers." Arthur was shot two times by defendant, once in the abdomen and once in his shoulder. Arthur was shot in the kitchen. After he was shot, Arthur passed out and remembered nothing until he awoke in the hospital. Arthur spent 29 days in the hospital due to the injuries he sustained on May 26,

1991. He was also required to undergo two surgeries during his hospitalization.

Anita was found dead in the kitchen. She was shot once in the right side of her torso and died from that wound. After Betty was shot, she went upstairs and lay on the side of the hallway, pretending she was dead. She saw defendant climbing the stairs. Once upstairs, defendant looked in Betty's bedroom. Defendant called for Tantrece but after getting no answer left the Howards' residence. Betty was treated for her injuries and released from the hospital later that day.

Prior to trial, on motion of defendant's public defender, a clinical psychologist, Dr. Daniel J. Cuneo, was appointed to examine defendant's fitness to stand trial and to determine whether defendant was sane at the time of the offenses. Dr. Cuneo concluded that defendant suffered from paranoid personality disorder, but that he was sane at the time of the offenses and was fit to stand trial. Dr. Cuneo summed up his interview with defendant as follows:

"It would be my opinion that Mr. Brown was suffering from a substantial disorder of thought, mood, and behavior (Paranoid Personality Disorder) which impaired his judgment and behavior at the time of the alleged offenses, but not to the extent that he was unable to appreciate the criminality of his conduct or to conform his behavior to the requirements of the law. Mr. Brown does suffer from a Paranoid Personality Disorder. He interprets all events to fit his narrow bias. He feels that his ex-wife destroyed his life by leaving him and has attributed to her every failing in his life. The only way he could deal with his daughter rejecting him was to hold to the belief that she was sexually abused by his in[-]laws whom he believes stole her from him. He feels mortally wronged by his ex[-]wife and her parents. His whole life since 1980 has revolved around his seeking vindication of this wrong. He interprets everything in light of this belief. Yet Mr. Brown knows that shooting others is wrong. He was not psychotic at the time. He had the ability to control his behavior. Therefore it would be my opinion that Freddie Brown was legally sane at the time of the alleged offenses."

At a hearing on October 30, 1991, the parties stipulated to Dr. Cuneo's report. The trial court found defendant fit to stand trial. On December 5, 1991, defense counsel filed notice that defendant would present the affirmative defense of insanity. On January 7, 1992, defendant expressed his desire to represent himself. The trial court admonished defendant about the problems and risks associated with

self-representation. Ultimately, the trial court allowed defendant to proceed *pro se*, but the court ordered the public defender to remain at counsel table with defendant throughout the trial. On February 4, 1992, defendant informed the trial court that he would not pursue an insanity defense at trial.

On March 16, 1992, the cause proceeded to trial with defendant representing himself. As ordered, a public defender sat at counsel table with defendant. Defendant's theory at trial was that he did not in fact shoot the victims but that Lavester Cook was the perpetrator. This is indicated by defendant's cross-examination of the State's witnesses. Defendant did not take the stand. At the close of the evidence, defendant asked the court to instruct the jury on aggravated battery as an alternative to attempted first-degree murder. The trial court denied defendant's request. The jury found defendant guilty of first-degree murder and two counts of attempted first-degree murder.

The presentence investigation revealed that defendant, who was then 38 years old, had no prior convictions or adjudications as delinquent as a juvenile. Defendant is a high school graduate and has completed about 1½ semesters at a local junior college. As previously alluded to, defendant did have a history of mental illness. In 1984, defendant was examined for purposes of receiving SSI disability benefits. He was diagnosed as schizophrenic. He was again examined for SSI purposes in 1989, when he was diagnosed as psychotic but "able to control his psychosis with withdrawal from reality, avoiding confrontations with people."

Victim impact statements from Lavester Cook and Betty Howard were submitted. Lavester complained that over the years defendant had attempted to ruin his Air Force career by falsely accusing him of child molestation. Betty complained that defendant harassed her family for over 10 years.

At sentencing, defendant's father testified in mitigation, as did his brother. Both testified that defendant suffered from some type of mental infirmity. Defendant also addressed the court. Defendant stated, "It is my opinion I am not a criminal." Defendant pointed out that this was a "family situation" and that he loved his ex-wife and daughter. Defendant showed no remorse and asked for the minimum sentence. The trial court noted in mitigation that defendant has a mental disease or defect and recommended defendant receive psychiatric care while confined. In aggravation, the trial court stated that "a sentence is necessary to deter the conduct of others who would perceive that once wed, they are forever entitled." The trial court sentenced defendant to 50 years in the Department of Corrections on

the murder conviction and 20 years in prison on each attempted murder conviction, the 20-year prison terms to run concurrently to each other and consecutively to the murder conviction.

## II

■ The first issue we are asked to consider is whether the trial court erred in refusing to give defendant's tendered jury instructions on aggravated battery. Defendant contends that there is some evidence in the record to permit a rational jury to conclude that defendant only intended to harm rather than to kill Betty and Arthur Howard, so the court should have instructed the jury on the less serious offense of aggravated battery. The State replies that the trial court was correct to refuse to give defendant's tendered instructions on aggravated battery because the evidence at trial did not require that defendant's aggravated battery instructions be given. We agree.

A defendant may be entitled to have the jury instructed on a less serious charge that is included in the one he is charged with. (*Beck v. Alabama* (1980), 447 U.S. 625, 636-37, 65 L. Ed. 2d 392, 402, 100 S. Ct. 2382, 2389.) The reason for a lesser-included-offense instruction is that it gives a third option to a juror who, believing the defendant was guilty of something but uncertain whether the offense charged has been proved, might otherwise convict rather than acquit the defendant of the greater offense. (*Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.) It is well established that aggravated battery is a lesser-included offense of attempted murder. (*People v. Jenkins* (1976), 41 Ill. App. 3d 392, 354 N.E.2d 139.) However, in order to convict for the crime of attempted murder, a finding that the defendant specifically intended to kill the victims is required; aggravated battery does not require specific intent. *People v. Fox* (1983), 114 Ill. App. 3d 593, 449 N.E.2d 261.

In *People v. Johnson* (1991), 219 Ill. App. 3d 460, 579 N.E.2d 978, our colleagues in the first district determined that the defendant was not entitled to have the jury instructed on the lesser-included offense of aggravated battery. It was sufficient that the jury was instructed on attempted murder. In *Johnson*, the defendant's alibi witnesses and the defendant's theory at trial advocated that defendant was not guilty of any crime whatsoever. (*Johnson*, 219 Ill. App. 3d at 465, 579 N.E.2d at 982.) The State, however, provided evidence that the defendant stabbed the victim in the back in an unprovoked attack and also tried to stab her in the face. The *Johnson* court concluded that an aggravated battery instruction was unnecessary because under those facts the jury could easily determine that the defendant had the

requisite intent to kill. (*Johnson*, 219 Ill. App. 3d at 466, 579 N.E.2d at 982.) The present case is similar.

Here, we reviewed the record and have no doubt that the jury could have concluded from the testimony that defendant had the requisite intent to kill both Arthur and Betty Howard. The evidence shows that defendant had a vendetta against the Howards for several years after his divorce from their daughter. A Department worker testified that she had many conversations with defendant concerning his daughter, his ex-wife, and his in-laws. On May 18, 1990, defendant called the Department worker and told her he had a gun and intended to kill his ex-wife or ex-in-laws and was contacting the Department so they might stop him. On the day of the occurrence in question, defendant stormed into the house and shot Betty Howard two times and stated, "I'm going to kill all you damn mother fuckers." Defendant shot Arthur Howard in the abdomen and shoulder, after which Arthur passed out. Defendant did kill his ex-wife. He then passed Betty in an upstairs hallway. Betty was lying on the floor pretending she was dead. Defendant made no attempt to assist either Arthur or Betty after he shot them. While defendant chose not to testify in the present case, his cross-examination reveals that his defense was that Lavester Cook actually shot the victims. Defendant did not present evidence that he did not intend to kill the victims when he shot them.

We are also unconvinced by defendant's argument that because Arthur and Betty Howard's injuries were not "life-threatening" the jury could have determined that defendant did not intend to kill the victims and, thus, aggravated battery instructions should have been given. The evidence was clear that Arthur Howard passed out after the attack and Betty Howard pretended she was dead. Defendant made no attempt to assist either of the Howards or to determine whether they were alive before he left the house. It is the function of the jury to determine the existence of the intent to kill necessary for a conviction of attempted murder, and such a determination will not be disturbed unless a reasonable doubt of defendant's guilt exists. (*People v. Tyler* (1989), 188 Ill. App. 3d 547, 544 N.E.2d 1077.) We believe the record supports the jury's determination that defendant had the intent necessary for a conviction of attempted murder. We do not believe this is a case in which the jury, believing defendant was guilty of something, went ahead and convicted defendant of attempted murder even though the requisite attempt was not proven. Therefore, the trial court did not commit reversible error by refusing to instruct the jury on the lesser-included offense of aggravated battery.

■ The other issue we are asked to consider is whether the trial court abused its discretion in sentencing defendant. Defendant contends the trial court abused its discretion in sentencing him to a term totaling 70 years' imprisonment because there was extensive evidence in mitigation and only one statutory aggravating factor. Defendant claims to have rehabilitative potential which would not be well served by the excessive length of his sentence. (*People v. Bigham* (1992), 226 Ill. App. 3d 1041, 590 N.E.2d 115.) Defendant requests that his sentence be reduced to a total not exceeding 40 years' imprisonment. The State responds that the trial court did not abuse its discretion, especially when one considers that defendant showed no remorse for his actions and believed that his actions were not "criminal" because they involved a "family situation." We find no abuse of discretion.

A conviction of murder carries a prison sentence of not less than 20 years and not more than 60 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).) A conviction for attempted murder carries a prison sentence of not less than six years and not more than 30 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(3).) The sentencing judge is in the best position to consider matters relating to sentencing determinations and is vested with wide discretion in making a reasoned judgment as to the penalty appropriate to the circumstances of each case. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 297, 531 N.E.2d 366, 368; *People v. Steppan* (1985),. 105 Ill. 2d 310, 473 N.E.2d 1300.) A sentence within the statutory guidelines that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense. *People v. Cabrera* (1987), 116 Ill. 2d 474, 493-94, 508 N.E.2d 708, 716.

We agree that defendant did have some factors in mitigation, including the fact that he was a first-time offender. However, defendant's lack of a prior record is not necessarily the most persuasive consideration at sentencing; the seriousness of the crime has been called the most important factor to be considered in imposing sentence. (*People v. Hernandez* (1990), 204 Ill. App. 3d 732, 740, 562 N.E.2d 219, 225.) Another factor in mitigation was defendant's mental infirmity; however, defendant was found fit to stand trial and sane at the time of the offenses. The trial court did take note of defendant's mental defect and stated on the record that defendant should receive psychiatric assistance during his incarceration.

We have reviewed the record and conclude that the 70-year prison term imposed by the trial court was not an abuse of discretion. The judge noted that the sentence was necessary to deter "others who would perceive that once wed, they are forever entitled." In our esti-

mation, the sentence was also necessary to stop defendant. Defendant harassed the Howard family for more than 10 years. Both Betty and Arthur survived the attack, and defendant's daughter, Tantrece, is also a potential target. As the State points out, defendant showed no remorse for his actions and believed that the judicial system had no right to be involved because it was a "family situation." We cannot agree that under these facts the trial court abused its discretion in sentencing defendant.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, P.J., and WELCH, J., concur.