NOTICE

Decision filed 07/19/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-02-0342

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
                                                  ) Circuit Court of
      Plaintiff-Appellee, ) Jefferson County.
                                                  )
v. ) No. 00-CF-69
                                                  )
DAWN WORKMAN, ) Honorable
                                                  ) Terry H. Gamber,
      Defendant-Appellant. ) Judge, presiding.

_____

      JUSTICE McGLYNN[1] delivered the opinion of the court:

      Dawn Workman appeals her conviction and 40-year prison sentence imposed after a jury found her guilty of first-degree murder. Workman was accused of planning and covering up the murder of her boyfriend's father, Garrett Kubicki, and encouraging her boyfriend, Jason Kubicki, to commit the murder so the pair could be together. Jason Kubicki was also convicted of first-degree murder for bludgeoning his father to death with a baseball bat and received a 50-year prison sentence.

      On appeal, Workman claims that she was not granted a speedy trial as mandated and defined by Illinois law. She also raises evidentiary issues and takes issue with the length of her sentence. This court originally wrote an opinion reversing Workman's conviction,

---

      [1]Justice Kuehn participated in oral argument. Justice McGlynn was later substituted on the panel and has read the briefs and listened to the audiotape of oral argument.

1

finding that the trial court had erroneously granted the State a continuance to complete DNA testing in spite of its lack of due diligence in obtaining the test results within the original 120-day speedy-trial limit. *People v. Workman*, No. 5-02-0342 (July 1, 2005). However, we granted the State's petition for rehearing, thereby vacating our July 1, 2005, opinion (see *PSL Realty Co. v. Granite Investment Co.*, 86 Ill. 2d 291, 305, 427 N.E.2d 563, 570 (1981)), and we now issue this opinion in its stead and affirm Workman's conviction and sentence.

Workman raises five issues on appeal. The first two issues concern Workman's right to a speedy trial. Workman was arrested on February 25, 2000, but was not brought to trial until February 26, 2002–just more than two years later. Two of the delays in this case were occasioned by a lab-testing backlog and a substitution of Workman's counsel. On appeal, Workman argues that these delays were improperly allowed by the trial court and that, therefore, she was denied her right to a speedy trial. We disagree.

Illinois law, in section 103-5(a) of the Code of Criminal Procedure of 1963 (Code), requires that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody." 725 ILCS 5/103-5(a) (West 2000). Specific delays are allowed, however, such as a delay to determine a defendant's fitness to stand trial or any delay occasioned by the defendant. 725 ILCS 5/103-5(a) (West 2000). "Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2000). Additionally, if the trial court determines that the State has exercised due diligence but has been unsuccessful in obtaining the results of DNA testing that are material to the case and that there are reasonable grounds to believe that those results may be obtained at a later day, the trial court may continue the cause on the application of the State for not more than an additional 120 days. 725 ILCS 5/103-5(c) (West 2000). "Every person not tried in accordance with *** this Section shall be

2

discharged from custody or released from the obligations of his bail or recognizance." 725 ILCS 5/103-5(d) (West 2000).

As stated above, Workman was arrested and taken into custody on February 25, 2000, and 733 days elapsed until she was brought to trial. If more than 120 of these days are attributable to the State, Workman's statutory right to a speedy trial has been violated.

In this case, Kubicki bludgeoned his father to death with a baseball bat and then dumped his body, with Workman's help, into Waltonville Lake as it laid inside the cab of his pickup truck. The body and the murder scene at the Kubicki house were discovered and processed by crime-scene technicians the day after the murder on February 24, 2000. Workman was arrested and taken into custody the next day. She was arraigned on a single charge of concealing a homicidal death, and after pleading not guilty, a jury trial was set for June 13, 2000.

During the May 2000 final pretrial conference, the State filed an amended information that charged Workman with four counts of first-degree murder and a count of armed robbery, as well as the preexisting charge of concealing a homicidal death. Workman's attorney explained that his client needed more time to contemplate her predicament and to reevaluate things in light of the offer the State tendered along with the new charges. After the State agreed, the pretrial conference was postponed until the next day.

The next day, Workman's attorney announced that plea negotiations were at a standstill and that Workman wanted to go to trial on June 13, 2000. In response, the State indicated that it needed a continuance in order to obtain lab results material to the trial. The State's Attorney requested that the June 13 setting be vacated for the following reason:

"[A] tremendous amount of forensic examination has to be done, analysis at the lab of materials in this case. None of which, to my knowledge, is back. I spoke to Detective Kemp yesterday. He's been in contact with the crime lab repeatedly. The backlog of

3

other cases there has prevented them from analyzing that evidence yet. So we don't have that material evidence in hand."

The State affirmed this request on June 5, 2000, by filing a formal motion to continue pursuant to section 103-5(c) of the Code (725 ILCS 5/103-5(c) (West 2000)), set forth above. A hearing on the motion was held on June 6, 2000, at which the State argued as follows:

"The People's motion to continue, your Honor, is based on the fact that there are numerous items in evidence that have been taken to the crime lab at Carbondale. Those items were transported almost immediately after the event in this case[,] with the bulk of them having been taken to the crime lab on March 1 of 2000. I have spoken with personnel there about the nature of these issues[,] and they have assured me that they can accomplish the analysis of these items within the time[]frame established in the motion, your Honor."

The State's written motion further explained that the backlog had been created in part by the maternity leave of one lab technician and the inability of another pregnant lab technician to use the chemicals necessary to complete the testing, due to the dangers it posed to her unborn child. After making a finding that the State had exercised due diligence in trying to obtain the lab test results in time for the original trial setting, the trial court granted the State's motion to continue on June 6, 2000, and reset the trial for August 1, 2000.

Thereafter, Workman's attorney was injured and could not work on his cases. A lengthy continuance was granted by the trial court, and the case was reset for a trial on February 27, 2001. In the meantime, Workman's attorney moved to have her evaluated to determine if she was mentally fit to stand trial. Workman was found fit on March 14, 2001, and the trial was again reset, for August 14, 2001.

The trial actually began on August 14, 2001, but on the next day, Workman's attorney moved to withdraw due to a conflict of interest. Workman's attorney had also represented

4

William Russell Hall, Workman's uncle and a prosecution witness, when Hall was charged with child pornography in 1996. During his representation of Hall, Workman's attorney learned that Hall had sexually abused Workman when she was five years old. Since an inherent conflict of interest existed, the trial court permitted Workman's original attorney to withdraw and appointed her new counsel. Jury selection then ceased and the case was reset for a trial on September 18, 2001. After Workman's new counsel requested more time to prepare, the trial was rescheduled for February 26, 2002.

The trial of Dawn Workman actually took place on February 26, 2002, and after a week of testimony, a jury found her guilty of first-degree murder. On May 2, 2002, the trial court sentenced Workman to 40 years' imprisonment.

A look back at this procedural history shows that the delays in getting to trial can be described in five categories: (1) a one-day delay attributable to Workman after new charges were issued and plea negotiations were taking place, (2) a delay due to lab testing, (3) a delay due to Workman's first attorney's injury, (4) a delay due to a mental fitness evaluation, and (5) a delay caused by the substitution of Workman's counsel due to a conflict of interest. As stated above, Workman argues that trial delays were improperly allowed for lab tests to be completed and for the substitution of her attorney when no conflict of interest existed.

We address the time allowed after her original attorney withdrew first. We flatly reject Workman's claim that her original attorney's motion to withdraw was improperly granted. Although we question why the conflict of interest could not have been determined earlier, Workman's original attorney clearly labored under a conflict that prohibited him from proceeding as her attorney. Therefore, we find no error in the trial court's grant of continuances after Workman's original attorney moved to withdraw and new counsel was appointed. Accordingly, any delay that occurred after Workman's first attorney withdrew on August 15, 2001, is properly attributable to the defendant.

5

Since the trial delays for Workman's original attorney's injury and for Workman's mental fitness evaluation are properly attributable to Workman as well, we need only address the 139-day time frame between Workman's arrest on February 25, 2000, and July 12, 2000–the date on which Workman's original attorney requested a trial continuance due to his injuries. The only delays during this time frame were the 1-day continuance requested by the defendant in order to contemplate the new charges brought against her and the 60-day continuance the trial court granted the State in order to complete DNA testing, which Workman argues was in error. Since the 1-day continuance is clearly attributable to Workman, we need only address the 60-day continuance for the DNA testing. Our review of the record reveals, however, that Workman's attorney failed to raise this issue before the trial court in a pretrial or posttrial motion. Therefore, we must determine, as Workman concedes at the end of her written argument on this first point, whether Workman was deprived of the effective assistance of counsel as a result.

To determine whether a defendant was denied the effective assistance of counsel, we apply the two-prong test set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255-56 (1984). As instructed by these two high courts, in order to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant so that he or she was deprived of a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

It is well-settled that the failure of counsel to move for the discharge of his client on the basis of a speedy-trial violation will constitute ineffective assistance of counsel when there is at least a reasonable probability that the client would have been discharged had a

6

timely motion been filed and there was no justification for the attorney's decision not to file the motion. *People v. Peco*, 345 Ill. App. 3d 724, 729, 803 N.E.2d 561, 565 (2004). Counsel also can be deemed ineffective if the issue is not raised in a posttrial motion. *Peco*, 345 Ill. App. 3d at 729, 803 N.E.2d at 565. However, counsel's failure to argue a speedy-trial violation cannot amount to constitutional incompetence if no basis for raising such a violation exists. *People v. Garcia*, 251 Ill. App. 3d 473, 478-79, 621 N.E.2d 1035, 1039 (1993).

Workman argues the trial court erred in finding that the State exercised due diligence in trying to procure the lab results before the original trial setting. Since the 60-day continuance allowed Workman to be tried after the 120-day speedy-trial limitation had expired, Workman argues that her right to a speedy trial was violated and that she should have been discharged.

The State, on the other hand, maintains that there is no actual need to review the trial court's finding of due diligence because the 120-day speedy-trial limitation had not begun to run when the trial court ruled on the motion. The State argues that all the time that expired between the initial arraignment on February 25, 2000, and the original trial setting of June 13, 2000, should be deemed delay that was agreed upon by the defendant because she made no oral or written demand for a trial. We disagree.

The 120-day term for an in-custody defendant clearly begins to run automatically as soon as the defendant is taken into custody and without a need for the defendant to make a formal demand for a trial. *Peco*, 345 Ill. App. 3d at 731, 803 N.E.2d at 566-67. Adopting the State's position on this issue would render the defendant's right to a speedy trial as codified by section 103-5(a) of the Code meaningless. *Peco*, 345 Ill. App. 3d at 731, 803 N.E.2d at 566. Accordingly, the speedy-trial "clock" began to run when Workman was incarcerated on February 25, 2000.

7

In the alternative, the State argues that if the speedy-trial "clock" began to run when Workman was incarcerated, it stopped after only 27 days when Workman agreed at a hearing on March 22, 2000, to the original June 13, 2000, trial setting. Again, we disagree with the State's calculation.

Our review of the two-page transcript from this brief hearing shows that Workman was informed that the grand jury had returned an indictment which read exactly the same as the previous information. Workman then waived her right to a formal arraignment and entered a plea of not guilty. The trial court then stated that since Workman had been in custody since February 25, 2000, the trial should be set on June 13, 2000, "or sooner"–which was within 120 days of February 25, 2000. Although we acknowledge that a defendant is considered to have agreed to any delay unless he or she objects by demanding a trial (*People v. Ingram*, 357 Ill. App. 3d 228, 233, 828 N.E.2d 763, 768 (2005)), we find that Workman had not agreed to any "delay" in this case. She had merely agreed that the original trial setting of June 13, 2000, which was within the speedy-trial time limit, was amenable with her schedule. This agreement, however, did not toll the speedy-trial "clock."

Based upon these calculations, the speedy-trial "clock" read 102 days on June 6, 2000,[2] when the trial court granted the State's motion for a continuance in order to complete the DNA testing. Because Workman specifically objected to this continuance on the record and indicated that she was "not going to waive any of her speedy[-]trial rights," the delay cannot be considered to be agreed upon and did not toll the speedy-trial "clock." See *Ingram*, 357 Ill. App. 3d at 233, 828 N.E.2d at 768. Therefore, the question is whether the 60-day

[2]This calculation takes into account the only delay up until this point–the one-day delay on May 31, 2000, requested by and attributable to the defendant after the new charges were brought against her.

8

continuance was proper and tolled the 120-day limitation or whether it was improper and caused Workman to be deprived of her right to a speedy trial.[3]  Accordingly, a review of the trial court's finding of due diligence is necessary.

To that end, Workman argues the State showed no due diligence, and she compares the circumstances presented here to those we faced in *People v. Battles*, 311 Ill. App. 3d 991, 724 N.E.2d 997 (2000).  In *Battles*, we admonished our lower courts to require the State to do more than merely request additional time within which to complete forensic testing, by setting out any specific facts suggesting why the forensic testing in that case could not be completed within the time frame of the defendant's right to a speedy trial.  *Battles*, 311 Ill. App. 3d at 997-98, 724 N.E.2d at 1002.

In this case, the State seemed mindful of the *Battles* requirements and explained that although it had exercised due diligence, it could not obtain the DNA results before the initial trial setting.  The State's section 103-5 motion to continue contained four paragraphs that address the State's assertion that it exercised due diligence:

---

[3]If the DNA continuance was improper, the speedy-trial "clock" would have continued to run.  Since the next delay attributable to Workman did not occur until July 12, 2000, when her attorney was injured, 138 days would have run up to this point (taking into account Workman's 1-day continuance discussed above).  Because this was beyond the 120-day limit, Workman's right to a speedy trial was violated if the DNA continuance was improper.

"6. The People have acted diligently in obtaining laboratory analyses of the evidence in that the bulk of the items were taken to the crime laboratory on March 1, 2000[,] in the week following the homicide.

7. Owing to a backlog of work at the Crime Laboratory and to the complicated and multi[]step analysis required, the analyses have not been done nor have reports been received.

8. On June 1, 2000[,] Gary Duncan spoke with laboratory personnel Dana Warren and Michael Norbut. Mr. Norbut does fingerprint and palmprint comparisons[,] and Ms. Warren does serology and biology. Mr. Norbut has not yet received the items for his analysis. Ms. Warren is presently engaged in analysis of the items[,] and her work must be performed prior to transfer to Mr. Norbet [*sic*].

9. Dana Warren told Gary Duncan she has a substantial backlog of work and just now is able to work cases from January and February of this year. She is the sole person in her section, her colleague, Stacey Spieth[,] is on maternity leave, and Ms. Warren herself is pregnant and cannot work with certain chemicals because of their known risk to pregnant women. For the latter reason, no DNA work is being done in her section at the Carbondale Laboratory. Any DNA analyses are transferred to other laboratories."

After careful consideration, we find the facts that one of the technicians was on maternity leave and the only other technician at the Carbondale lab was also pregnant at the time and could not work with certain chemicals because of significant risks to her unborn baby provided a sufficient reason to excuse the State's delay in obtaining the test results. While an accused's right to a speedy trial should never be taken lightly, it would be unreasonable for the trial court to demand that a laboratory technician decide between the health of her unborn child and the need for the immediate processing of certain laboratory

10

results. Accordingly, we see no error in the trial court's finding of the State's due diligence despite the delay.

After making this determination, we turn back to the issue of whether it was ineffective for Workman's attorney not to have objected to this motion to continue or to have raised it in a posttrial motion. Put simply, we find that it was not. The basis for the State's motion was more than reasonable. To require defense counsel to object to the motion or risk being labeled as inadequate or ineffective in the representation of the interests of his client seems to be an unreasonable burden for courts to impose. Therefore, we find the trial court's grant of the continuance was proper and tolled the speedy-trial "clock." Accordingly, Workman's right to a speedy trial was not violated.

Workman next contends that she was denied a fair trial because she was unable to fully confront one of the State's witnesses, Workman's uncle–William Russell Hall. Hall had admitted to sexually abusing Workman when she was a small child. Nevertheless, Workman lived with Hall voluntarily when she was not living with the Kubicki family. It is for that reason that Hall was called to testify against Workman. Workman returned to Hall's house the day after the murder and asked Hall questions about the disposing of a body in water. Workman contends she was unable to fully confront Hall as a witness because she was unable to use a 1996 psychological report, in which he admits that he had sexually abused Workman, to impeach him at the trial. We disagree.

In 1996, Hall was psychologically evaluated after child pornography charges were brought against him by the State. During that evaluation, Hall admitted that he had sexually molested Workman when she was five years old. Workman sought to use the 1996 report to impeach Hall as he testified against her, but the trial court ruled that the report was a confidential mental health record and not subject to disclosure to Workman through discovery. Therefore, at the trial, Workman could only ask Hall whether he had ever

11

admitted to anyone that he had molested Workman as a child. After Hall testified that he had never mistreated Workman and that their relationship was a good and loving uncle/niece relationship, Workman asked Hall directly if he remembered telling the police that he had molested her when she was five years old. Hall asserted his fifth amendment right not to answer, and Workman concluded her cross-examination.

We find no error in the trial court's restriction of the psychological report since it was privileged and confidential under the Mental Health and Developmental Disabilities Confidentiality Act (Act) (740 ILCS 110/3(a) (West 2000)). Hall never consented to the use of the report, and no other provision of the Act allowed its use. See *People v. Bean*, 137 Ill. 2d 65, 89-101, 560 N.E.2d 258, 269-74 (1990). Additionally, it is unlikely that had the report been produced, it would have been admissible to impeach Hall. The abuse occurred in 1985–more than 10 years before the trial–and never resulted in a criminal charge or conviction. We also find it clear that the jury knew that Hall had sexually abused Workman as a child. Workman testified about the abuse when she took the stand, and this fact was all but confirmed when Hall invoked the fifth amendment when asked about it. Accordingly, we find no error in the trial court's suppression of the 1996 Hall report.

Workman next takes issue with the trial court's denial of her motion for a mistrial after a detective testified that a jailer had told him that he thought he saw gang symbols and writing on a pad of paper on Workman's jailhouse bunk. Workman contends this testimony deprived her of a fair trial because the trial court had issued a pretrial order barring testimony regarding gang affiliation. We disagree.

First, the testimony was unsolicited by the State. Second, we find that the reference was brief and vague. Third, any error was cured by the trial court's instruction to the jury to disregard it. Fourth, the brief reference to gang symbols on the notepad was overshadowed by the reason the notepad was confiscated–the fact that it contained Workman's handwritten

12

account of her version of the murder. Lastly, the notepad was never tendered to the jury, and the jury never saw any of the supposed gang symbols. Accordingly, we find no error in the trial court's denial of Workman's motion for a mistrial based upon this evidence. It was within the trial court's discretion to deny the mistrial, and given the reasons set forth above and the trial court's admonishment to the jury to disregard it, we find no error.

In her final point on appeal, Workman contends that her 40-year sentence is excessive in light of her youth, her negligible criminal history, her minor role in the offense, and her tumultuous social history. We disagree.

The sentencing court is in the best position to consider matters relating to sentencing determinations and is vested with wide discretion in making a reasoned judgment on the penalty appropriate for the circumstances of each case. *People v. Brown*, 250 Ill. App. 3d 767, 774, 620 N.E.2d 674, 679 (1993). A sentence within the statutory guidelines that is alleged to be excessive will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense. *Brown*, 250 Ill. App. 3d at 774, 620 N.E.2d at 679.

In this case, testimony adduced at the trial showed that Workman was the instigator of the crime and that her boyfriend would have never killed his father had Workman not persuaded him. There was also testimony that the plan was to kill the entire Kubicki family. The murder was also premeditated since the pair bought supplies beforehand, such as gloves to conceal their fingerprints. It is also clear that the motive for the murder was trivial and selfish; Workman was angered that she was disliked by the Kubickis and could no longer live in their home. There was also evidence that Workman wanted the entire family dead so that the two could live in the family home.

Workman also had a criminal history. She had been convicted of felony theft and obstructing a peace officer and was on felony probation, which she had already violated, at

13

the time of the murder. She had also dropped out of school in the eighth grade and had almost no work history.

We also note that 40 years is the middle of the sentencing range for murder. Given the evidence in this case, the aggravating factors, and the lack of mitigating factors, as well as the trial court's broad discretion in sentencing matters, we find no abuse of the trial court's discretion in sentencing Workman to 40 years' imprisonment and find that it is not disproportionate to the crime.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

GOLDENHERSH, J., concurs.

JUSTICE DONOVAN, dissenting:

I concur in the majority opinion in all aspects, save one. I do not agree that the State established that it had exercised due diligence to accomplish the testing of material evidence within the speedy-trial period, and therefore I must respectfully dissent.

In *People v. Battles*, this court held that when the State files a motion to continue pursuant to section 103-5(c) of the Code (725 ILCS 5/103-5(c) (West 2000)), it has the burden to show that law enforcement authorities "have made a prudent and assiduous effort" to complete the testing of evidence before the expiration of the 120-day speedy-trial period. *People v. Battles*, 311 Ill. App. 3d 991, 997, 724 N.E.2d 997, 1002 (2000). After *Battles*, prosecutors and law enforcement personnel were on notice that the "rapid retrieval of testing materials and delivery of those materials to a crime lab," standing alone, would be considered inadequate to establish due diligence. *Battles*, 311 Ill. App. 3d at 1000, 724 N.E.2d at 1004. The prosecution team was also warned that it would be required to provide something more

than the mere assertion of a backlog to support a due diligence finding. *Battles*, 311 Ill. App. 3d at 1001, 724 N.E.2d at 1004-05.

In its oral and written arguments to the trial court in this case, the State sought a continuance of not more than 60 days due to the unavailability of material evidence. The continuance was not sought to obtain DNA analyses. In its motion, the State asserted that certain pieces of evidence had not been tested because one of the technicians at the Carbondale laboratory, Stacey Spieth, was on maternity leave and the only other technician, Dana Warren, had a substantial backlog. As of June 2000, Ms. Warren was conducting tests on evidentiary materials that had been submitted in January and February of that year.

In my view, the information offered in support of the State's assertion of due diligence is substantively similar to that which we rejected in *Battles*. In this case, as in *Battles*, the State did not provide the trial court with any facts to explain the backlog, and more importantly, it did not identify what actions, if any, had been taken to deal with the backlog and to promote or expedite the testing of materials for this case. See *Battles*, 311 Ill. App. 3d at 999-1001, 724 N.E.2d at 1003-04. There is no indication that the prosecution or the law enforcement authorities impressed upon the Carbondale lab that the testing in this case should be expedited or that they otherwise acted with any sense of urgency. See *Battles*, 311 Ill. App. 3d at 1001, 724 N.E.2d at 1004; *People v. Durham*, 193 Ill. App. 3d 545, 550 N.E.2d 259 (1990). While it is likely that there will always be some testing backlog and staffing issues, a detained criminal defendant who has demanded a speedy trial should not be required to bear the brunt of those conditions in the absence of some evidence that the State, prior to requesting a continuance, had made reasonable efforts to secure the testing and to obtain the results within the speedy-trial period.

In this case, the majority finds that the State's delay in obtaining the test results was excusable because "one of the technicians was on maternity leave and the only other

15

technician at the Carbondale lab was also pregnant at the time and could not work with certain chemicals because of significant risks to her unborn baby."  Slip op. at 10.  The majority goes on to comment, "While an accused's right to a speedy trial should never be taken lightly, it would be unreasonable for the trial court to demand that a laboratory technician decide between the health of her unborn child and the need for immediate processing of certain laboratory results." Slip op. at 10.  I am both perplexed and troubled by these findings.  I have scrutinized the State's motion and its arguments before the trial court, and I find no assertion, nor any evidence, that the delay in obtaining the test results in this case occurred because the required testing posed any health risk to Dana Warren or her unborn baby.

Paragraph 9 of the State's motion states as follows:

"9.  Dana Warren told Gary Duncan she has a substantial backlog of work and just now is able to work cases from January and February of this year.  She is the sole person in her section, her colleague, Stacey Spieth[,] is on maternity leave, and Ms. Warren herself is pregnant and cannot work with certain chemicals because of their known risk to pregnant women. *For the latter reason, no DNA work is being done in her section at the Carbondale Laboratory.  Any DNA analyses are transferred to other laboratories.*"  (Emphasis added.)

The factual assertions set forth in paragraph 9 demonstrate that the Carbondale laboratory had taken steps to protect the health of Ms. Warren and her unborn baby by suspending any DNA testing in her lab and transferring all DNA analyses to other labs.  There is no assertion that Ms. Warren was unable to safely perform the testing that was required in this case.  There is no assertion that any aspect of that testing posed health risks to pregnant women.  In this case, the trial court was not faced with a Hobson's choice between preserving the defendant's right to a speedy trial and protecting the health of the laboratory

16

worker and her unborn baby.  Therefore, the majority's suggestion regarding how it may judge a trial court's action under such fictional circumstances seems to be an ill-advised prejudgment of an issue that is not before us.

Based on the record, I conclude that the State failed to meet its burden to show due diligence and thereby violated the defendant's statutory right to a speedy trial.  Because the defendant received ineffective assistance of counsel and because the State's speedy-trial violation cannot be undone, I believe that a reversal of the defendant's conviction is mandated.  For the reasons stated herein, I respectfully dissent.

NO. 5-02-0342

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
                                      ) Circuit Court of
    Plaintiff-Appellee,            ) Jefferson County.
                                      )
v.                                    ) No. 00-CF-69
                                      )
DAWN WORKMAN,                         ) Honorable
                                      ) Terry H. Gamber,
    Defendant-Appellant.           ) Judge, presiding.
_____

**Opinion Filed**:    July 19, 2006

_____

**Justices**:    Honorable Stephen P. McGlynn, J.

             Honorable Richard P. Goldenhersh, J.,
             Concurs
             Honorable James K. Donovan, J.,
             Dissents

_____

**Attorneys**    Daniel M. Kirwan, Deputy Defender, Paige Clark Strawn, Assistant Defender, Office
**for**    of the State Appellate Defender, Fifth Judicial District, 730 E. Illinois Highway 15,
**Appellant**    Suite #1, Mt. Vernon, IL 62864

_____

**Attorneys**    Hon. Gary Duncan, State's Attorney, Jefferson County Courthouse, Mt. Vernon, IL
**for**    62864; Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Kevin D.
**Appellee**    Sweeney, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730
             E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____