NOTICE

Decision filed 11/30/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170404-U

NO. 5-17-0404

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 14-CF-1517 |
| | ) | |
| CRAIG D. MILLER, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Overstreet and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction for first degree murder is affirmed where the trial court did not err in denying his motion to suppress statements, where he was not denied effective assistance of counsel, and where his sentence was not excessive.

¶ 2    This is a direct appeal from the Madison County circuit court. The defendant, Craig Miller, was tried and convicted of first degree murder, for shooting and killing the victim, Malik Garrett, in the parking lot of Smiley's Market in Madison, Illinois. The defendant was subsequently sentenced to 40 years' imprisonment to be followed by 3 years of mandatory supervised release (MSR). For the reasons that follow, we affirm.

1

¶ 3        I. BACKGROUND

¶ 4        A. Factual History

¶ 5  The facts of this case were generally undisputed with regards to the shooting of the victim and the defendant's involvement. On July 11, 2014, at approximately 4:45 p.m., a drive-by shooting occurred at the residence of Yolanda Edwards, located in Brooklyn, Illinois, where the defendant, who was 17 years old at the time, also resided. One of the fired bullets lodged into the headboard of the bed in which Edwards was sleeping, a few inches above her head. Brooklyn police were called and arrived at Edwards's residence in response to the drive-by shooting. They interviewed both Edwards and the defendant. After the defendant spoke to the police, someone told the defendant that the victim was the shooter in the drive-by. Roughly 30 minutes later, at approximately 5:15 p.m., the defendant, believing the victim to be the perpetrator of the drive-by, tracked the victim to Smiley's Market in Madison. The victim was gathered with three other people. The defendant approached the group from behind, yelled to get the victim's attention, and then opened fire. The defendant fired multiple rounds, hitting the victim once in the left leg and twice in the abdomen. The victim was 16 years old at the time. The victim fell to the ground, and police quickly reported to the scene. While lying in the parking lot waiting for an ambulance, the victim identified the defendant as the person who shot him. There were several witnesses to the victim's identification of the defendant. The victim was then taken to Gateway Regional Hospital (Gateway), where he then died. Later that same day, the defendant was arrested by the Madison Police Department. He was brought to the police department and questioned about his involvement in the victim's

2

shooting. Though he initially denied involvement, he eventually began making incriminating statements to the officers and admitted to being the shooter. He was subsequently charged with first degree murder.

¶ 6                                    B. Procedural History

¶ 7     On July 14, 2014, the defendant was charged by information with two alternative theories of first degree murder and unlawful discharge of a firearm.

¶ 8     On August 31, 2016, the defendant filed a motion *in limine* asking the trial court to prohibit the State from introducing evidence regarding the statements or identifications allegedly made by the victim, and a motion to suppress statements made by the defendant to police. On September 30, 2016, the State filed a notice of intent to introduce prior statements of the victim pursuant to Illinois Rule of Evidence 804(b)(2) (eff. Jan. 1, 2011).

¶ 9     On October 6, 2016, following a hearing, the trial court entered an order denying the motion to suppress, finding that the defendant's statements to the police were knowingly and voluntarily made, after he waived his *Miranda* rights, and without any threats or coercion. On October 25, 2016, the defendant filed a motion to reconsider the denial of his motion to suppress. On November 3, 2016, he filed a request for rehearing on the motion. On November 23, 2016, the State filed a notice of intent to introduce the victim's out of court statements.

¶ 10    On December 8, 2016, the trial court entered an order denying the defendant's motion *in limine* to bar out of court statements made by the victim and granting the State's notice of intent to introduce the victim's statements pursuant to Illinois Rule of

3

Evidence 804(b)(2). It also denied the defendant's motion to reconsider the denial of the motion to suppress.

¶ 11　On February 1, 2017, the defendant filed a motion to suppress his statements made while in police custody, and the State filed a response the next day. On February 8, 2017, the defendant filed a motion to dismiss the felony case and transfer to juvenile court. That same day, he also filed a notice of intent to request a second degree murder jury instruction. On February 24, 2017, following argument, the trial court entered a written order denying the defendant's motion to suppress filed February 1, 2017, and denying the defendant's motion to dismiss the felony charge and transfer to juvenile court.

¶ 12　On April 11, 2017, a jury trial began. Prior to opening statements, the trial court admonished the jury, including an admonishment that neither opening statements nor closing arguments were evidence and should not be considered by the jury as evidence. Nevertheless, during opening statement, defense counsel told the jury in Brooklyn "there's corruption in the police force, in the local government."

¶ 13　In addition to the factual evidence discussed *supra*, the following relevant evidence was introduced at trial.

¶ 14　Megan O'Brien testified that at the time of the shooting, she was employed as a paramedic and was dispatched to Smiley's Market for a male with multiple gunshot wounds. O'Brien was informed by dispatch that police were already on the scene, and the scene was secure. After arriving and locating the victim, she noted that he was still awake, and she initially did not observe a lot of blood. He was leaning up against a police squad car and appeared to have a deformity in his left leg. After an initial

4

assessment on the scene, the victim was loaded into the ambulance. Once in the ambulance, she was able to better assess the victim's condition and noted three gunshot wounds. The victim was transported to Gateway. At the time of his admittance to Gateway, his condition was severe, and he was unconscious.

¶ 15 Detective Michael Renth testified that on July 11, 2014, he was dispatched to Smiley's Market in response to a shooting. He responded to the call and upon arrival observed the victim lying on the ground and conscious. He immediately went to the victim's assistance and began asking him questions about what had happened. The victim said he had been shot all over. Renth asked him who shot him, and the victim responded, "I can't tell you." He continued to assist the victim and check for injuries. The victim then said, "Officer, I need you." Renth was still assisting him when the victim said, "Craig shot me, Craig from Brooklyn, Craig Miller shot me." Renth observed that the victim was not armed with a weapon. Once the scene was contained, he reported the victim's statements identifying the defendant as the shooter to Chief Tony Tomlinson, who was the chief of police in Brooklyn at that time. Once the paramedics arrived, Renth began canvassing the scene for evidence. He found three 9-millimeter Luger Winchester shell casings approximately 15 feet from where the victim had been lying and relatively close to one another—"within a foot or so."

¶ 16 Antionette Compton, the victim's aunt, also arrived at the scene while the victim was still lying in the parking lot. Upon arriving at the scene, she picked the victim up into her arms and asked him who had shot him. The victim responded "Craig Miller." She said "Who?" and he again said "Craig Miller."

¶ 17    Benny Dunnavant, a witness to the shooting, testified that he saw four youths standing by the sidewalk that ran alongside Smiley's Market when suddenly there was a bang. He then saw a person come running up from behind the market. He heard at least four shots. He "hit the ground, because they was runnin' in [his] direction, and this young man was runnin' crazily with that gun shootin' " and he covered his head. He then heard a young man say that he had been shot in the knee. He looked up and saw the young man fall 15 feet away from him. He heard an additional one to two shots fired after the victim was lying on the ground.

¶ 18    Lieutenant Dennis Pinero testified that he was also dispatched to Smiley's Market in response to a shooting. Upon arriving, he spoke with the victim alongside Renth. He observed that the victim was reluctant to cooperate with Renth and identify his shooter so, because Pinero felt he had a good rapport with the victim based on prior interactions with him over the course of his 17-year career, he explained to the victim that he needed to identify his shooter because the police did not know what was going on. The victim then responded that "Craig did it." The victim further stated, "Little Craig," and then said the defendant's full name, Craig Miller.

¶ 19    After Pinero's testimony, outside the presence of the jury, the State noted the defense's references to a corrupt Brooklyn and corrupt Brooklyn Police Department, including the comments made during opening statements, and moved that the defense be barred from questioning Chief Tomlinson about anything related to these topics during his testimony. The State noted that this line of questioning was irrelevant and violated the previously granted motion *in limine* filed by the State barring any general references

to police corruption in the Brooklyn Police Department by the defense. Defense counsel responded that he did intend to question Tomlinson about the general corruption in the Brooklyn Police Department. The trial court responded that general questions would be barred and that any questions regarding specific findings of corruption within the Brooklyn Police Department had to be relevant to the case at hand. The court ruled that the defense would be allowed to bring witnesses to testify to the beliefs of the defendant in that he did not believe the Brooklyn police would act on his behalf and that they did not investigate crimes; however, other evidence related to corruption within the Brooklyn Police Department—*i.e.*, blanket corruption—was irrelevant and would be barred.

¶ 20   Joshua Easton, a crime scene investigator, was requested to assist in the investigation of the Smiley's Market shooting. He first reported to the Madison Police Department where Renth surrendered to him the three shell casings he had recovered earlier from the Smiley's Market parking lot. Easton then reported to the parking lot to process the scene. He photographed and documented its then current state and collected evidence, including blood evidence and two additional shell casings, found near the alleyway on the north side of the building. He also attended the victim's autopsy, wherein five projectiles or projectile fragments were removed from the victim.

¶ 21   Arron Horn, a forensic scientist, testified as an expert in firearm identification. He testified that he compared the shell casings recovered by Renth to the casings recovered by Easton and found that all five casings were "9mm Luger cartridge cases, they all had the same shape of firing pins, so they all had hemispherical firing pin impressions and

7

they all had parallel breech face marks." It was his opinion that all five shell casings had been fired from the same firearm.

¶ 22   Eric Alfaro testified as an employee of the city of Madison. He attested that the city of Madison is equipped with approximately 29 surveillance cameras. At the police department's request, he retrieved two videos related to the shooting. The first video was recorded by a pan, tilt, and zoom (PTZ) camera located at 3rd Street and Madison Avenue. The video is 19 minutes and 25 seconds long and begins on July 11, 2014, at 5:16:37 p.m. It depicts the following. Starting at 5:17:40 p.m. four people have gathered on a sidewalk that runs along the side of a building. At 5:17:56 p.m. there is some kind of commotion, and the group scatters; it appears that two of the group run towards the left of the screen. At 5:17:59 p.m., a person dressed in all black enters the screen coming from the side of the building and running to the left of the screen, in the same direction as the two persons that fled. At 5:18:04 p.m., all parties are off screen outside the view of the camera. At 5:18:14 p.m., the person dressed in all black reenters the frame from the left and runs back to the side of the building from where he first appeared. At 5:19 p.m., the camera rotates to show where a crowd has begun to gather in the parking lot. At 5:19:52 p.m., police arrive on the scene and an officer can be seen exiting his squad car. People continue to gather, and various civilian vehicles pull up to the scene. At 5:20:36 p.m., a second police squad car arrives. Civilians can then be seen beginning to disperse. At 5:21:26 p.m., the camera zooms in on the scene, and the video now shows a person lying on the ground surrounded by a few people. Once several more civilians disperse, a person is seen lying on their side, there is one person standing over them near their head,

8

and an officer is kneeling next to them. Numerous officers can be seen clearing the scene, maintaining a perimeter, and keeping away approaching civilians. At several points in the video, the victim is approached by different officers, but the first officer remains with them until the scene is controlled. At 5:26:26 p.m., the camera begins to zoom out. Officers can be seen leaving the scene. The first officer and the civilian remain with the victim. At 5:29:55 p.m., an ambulance arrives. At 5:30:16 p.m., the camera zooms in, and paramedics can be seen assessing the victim and preparing them to be loaded onto the ambulance. At 5:33:16 p.m., the victim is loaded. The video ends at 5:36:02 p.m., at which point the ambulance is still at the scene and has yet to depart.

¶ 23 The second video is 34 seconds long and begins at 5:19:18 p.m. It was captured by a stationary camera (non PTZ) located at 2nd Street and Alton Street in Madison, approximately 8 to 10 blocks from Smiley's Market. It shows a person dressed in all black running toward, and then getting into, a gold sedan which immediately drives away.

¶ 24 Kirstie Williams testified that on July 11, 2014, she picked up the defendant in Madison in her gold Chevrolet Malibu. There were also two other passengers in the car with her. The defendant had flagged her down and wanted a ride home, so she drove him back to Brooklyn.

¶ 25 Chief Tony Tomlinson testified that on July 11, 2014, he was the chief of police of Brooklyn. At approximately 4:45 p.m. that day, he was dispatched to the residence of Yolanda Edwards in Brooklyn for shots fired. Once he arrived on the scene, he made contact with both Edwards and the defendant. He asked the defendant if he knew who

9

had shot at the house, and the defendant responded that "he did not know who shot at him or who would shoot at him." The defendant also told him that "they would handle it in the streets." Thirty minutes after speaking with the defendant, Tomlinson was dispatched to another shooting, this time in Madison. Upon arriving at the scene, he saw the victim lying on the ground, bleeding, unable to get up, and being talked to by police officers. He approached the victim and asked him who shot him. The victim responded, "Little Craig." He asked who Little Craig was, and the victim responded, "Little Craig from Brooklyn." He then asked the victim if the victim knew the shooter's last name, and the victim responded "Craig Miller, Craig Miller." He stayed with the victim until the victim was loaded into the ambulance.

¶ 26    Chief Tomlinson also testified that in the days following July 11, he continued his investigation into the perpetrator of the shooting at Edwards's residence. Jarod Harrod was eventually identified as the shooter, though Tomlinson was no longer involved in the investigation at that point. Harrod was subsequently charged with, and pled guilty to, aggravated discharge of a firearm.

¶ 27    The trial court heard argument outside the presence of the jury as to whether the State should be allowed to enter into evidence a certified copy of Harrod's conviction for the shooting at Edwards's residence. The defense argued that it was irrelevant because the issue at trial concerned the defendant's belief as to who shot at Edwards's house, regardless of whether he was mistaken. Defense counsel informed the court that it was unfair to simply allow the copy of the conviction to be entered and that he mistakenly assumed that the State was going to call Harrod as a witness. Furthermore, he had

received information that Harrod might not be competent to testify. Therefore, it was the defense's position that the jury should know the entire disposition of Harrod's case—specifically that he was released after one month and placed on probation. The court reserved ruling until the following morning.

¶ 28 The next morning, the State informed the trial court that they were declining to introduce the copy of conviction and therefore the previous day's arguments were moot. The State also filed a memorandum of law regarding self-defense. The trial then recommenced. The State played a video of the defendant's July 11 interrogation. Detective Brian Werner testified that on July 11, 2014, he was a detective with the Madison Police Department. He was tasked with interviewing the defendant. The interview was conducted at the Madison Police Department and began at approximately 9:10 p.m. For approximately 1 hour and 20 minutes, the defendant denied any involvement in the victim's shooting. However, he then began making incriminating statements.

¶ 29 Following the testimony of Detective Werner, the State rested, and the defendant moved for a directed verdict, which was denied. The defense then presented its case-in-chief.

¶ 30 Yolanda Edwards testified that in 2014 she resided in Brooklyn. The defendant was living with her at the time along with her daughter, son, and grandchild. On July 11, 2014, she came home from work and went to lie in her bed. Approximately 10 to 15 minutes later, she heard what sounded like a pop. She jumped out of bed and went to her front door. A gentleman walking past her house asked if she was okay and informed her

11

that her window had been hit. She returned to her room and noticed the hole in the window as well as a bullet in her bedpost that had struck right above where her head had been when she was lying down. The commotion awoke the defendant, and she explained to him what had just occurred. They were both afraid because contact had been made. She then called the police, and they came to her house. The police were able to retrieve the bullet from the bedpost. She spoke to the police and then suggested they also speak to the defendant.

¶ 31    The defendant testified that on July 11, 2014, he was living at Edwards's residence and had been for two years. He considered Edwards to be a mother figure. The first time the defendant was shot at he was 13 years old, and he had been shot at "countless" times since then. At 14 or 15 years old he began carrying a gun for protection. He felt like the Brooklyn police were not going to protect him, and nothing had ever come of any investigation in which he was involved that was conducted by Brooklyn police. He felt there was no point in calling the police when he was shot at. He felt it was his job to protect himself and his loved ones. Prior to July 11, he knew the victim from previous confrontations, including being shot at by the victim on a prior date. The victim was friends with Harrod, who was eventually charged with the shooting of Edwards's home. The defendant believed Harrod and the victim referred to their group of friends as the Dirt Gang. They had threatened the defendant on numerous occasions. On July 11, he was asleep at Edwards's home when he was awoken by gunfire. This was the first time shots had been fired at the residence. He felt like he and his family were in danger, and he was scared and angry. He was told that the victim had shot at the house and was seen

hanging out of the window of a car. He did not trust that Chief Tomlinson was going to protect him or his family because Tomlinson had told him on a previous occasion "next time you run from me, I'm going to kill you." Because he felt that the Brooklyn police would do nothing to protect him from the danger posed by the victim, he decided to take matters into his own hands. He went to Madison and found the victim with a group of people. He approached the victim. The defendant thought the victim was acting like he was reaching for something so the defendant opened fire, and the victim began to flee. The defendant pursued him, running across the parking lot shooting at the victim while the victim tried to take cover.

¶ 32   On cross-examination, the defendant testified that he fired his gun eight times but did not know how many times he hit the victim. He could not recall what he did with the gun after the shooting and was still unaware of its location. After the shooting in Brooklyn, Donnie Sherrell gave him a ride to Madison, where they drove around until they spotted the victim at Smiley's Market. He was dropped off a block or two away so that he had the element of surprise. In order to get the victim's attention, he yelled "hey, b***h-a** dude." The victim turned and looked at him, and when the victim appeared to be reaching, he opened fire. The victim ran and so he chased him. The defendant denied firing at the victim while he was on the ground. He admitted to previously shooting at people. He went after the victim because he felt like he needed to protect his family.

¶ 33   Following the defendant's testimony, both sides rested, and the defendant moved for a directed verdict of not guilty of first degree murder, guilty of second degree murder, which the trial court denied. The court held a jury instruction conference that continued

13

into the following morning of April 13, 2017. After argument from the parties, the court finalized the jury instructions, and the jury returned for closing arguments and instruction. Thereafter, the case was given to the jury. Following deliberations, the jury found the defendant guilty of first degree murder, and the court entered judgment.

¶ 34 On May 11, 2017, the defendant filed a motion for new trial. On August 2, 2017, the trial court held a hearing on the motion, after which the motion was denied. The court then began the sentencing hearing, which continued into the following morning. The next day, the remainder of the hearing was held, and the court immediately proceeded to sentencing. Before delivering the sentence, the court stated on the record that it had considered all of the factors in mitigation argued by defense counsel, including the defendant's age, potential for rehabilitation, factors surrounding the case, and the events leading up to the shooting; the evidence; the presentence investigation report; and arguments of counsel. The court sentenced the defendant to 40 years' incarceration to be followed by 3 years of MSR.

¶ 35 On August 16, 2017, the defendant filed a motion to reconsider sentence, arguing that the trial court did not give proper weight to the factors in mitigation, that it gave undue weight to the factors in aggravation, that it failed to consider his rehabilitative potential, and that the sentence was excessive considering other sentences for more serious offenses.

¶ 36 On October 19, 2017, the trial court held a hearing on the defendant's motion, after which the motion was denied. On October 23, 2017, the defendant filed a notice of appeal.

14

¶ 37                                    II. ANALYSIS

¶ 38    The defendant raises three issues on appeal.  First, that the trial court committed reversible error in denying his motion to suppress his incriminating statements made to police.  Second, that he was denied effective assistance of trial counsel where the totality of counsel's errors resulted in a first degree murder conviction instead of a lesser second degree conviction.  Lastly, that his sentence was excessive and constituted a *de facto* life sentence.

¶ 39                                 A. Motion to Suppress

¶ 40    First, the defendant argues that he is entitled to a new trial where the trial court erroneously denied his motion to suppress.  When reviewing a trial court's ruling on a motion to suppress, we defer to the court's findings of fact unless they are clearly against the manifest weight of the evidence.  *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006).  We review *de novo* whether the facts support the court's determination.  *Id.*

¶ 41    The defendant asserts that the motion should have been granted where the *Miranda* admonishments he received were not sufficient pursuant to the amendment to section 5-401.5 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-401.5 (West 2016)), as he was only 17 years old at the time of the interrogation and did not have experience with law enforcement.  His argument relies on his assertion that the amendment to section 5-401.5 of the Act should retroactively apply to him.  The amendment was not in effect until January 1, 2017, 2½ years after the defendant's interrogation (see *id.*).  The amendment enacted additional *Miranda* admonishments for juveniles by requiring that they not only be informed of their right to remain silent, but

15

they must also be informed of their right to stop the interview at any time. It also enacted additional safeguards regarding waiver.

¶ 42   The defendant maintains that he was not afforded the opportunity to assert his rights, nor did he explicitly waive his rights. He further asserts that because his admonishments were not sufficient, his statements to police were presumptively inadmissible.

¶ 43   When this issue was first raised in the trial court, the court determined that the amendment did not apply to the defendant retroactively. Whether the trial court erred in so ruling is not a question that this court needs to answer. Assuming *arguendo* that admission of the defendant's statements was improper, any resulting constitutional error was harmless. A constitutional error is harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). There are three approaches a court may use in determining whether an error was harmless: "(1) focus on the error to determine if it contributed to the conviction, (2) analyze the other evidence in the case to determine if there is overwhelming evidence that supports the conviction, and (3) determine if the improperly admitted evidence is merely cumulative or duplicates evidence that was properly admitted." *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 73.

¶ 44   Here, we must determine whether, after disregarding the defendant's interrogation statements, there was overwhelming evidence supporting the defendant's conviction for first degree murder.

16

¶ 45    In order to sustain a charge of first degree murder, the evidence must prove beyond a reasonable doubt that defendant performed the acts that caused the victim's death, that when defendant did so he knew such acts would either cause death or create a strong probability of death or great bodily harm, and that defendant was not justified in using the force which he used.  720 ILCS 5/9-1, 9-2(a), (b) (West 2014).

¶ 46    Here, the State presented video evidence showing the defendant chasing after the victim in the Smiley's Market parking lot.  There was also video several blocks away from Smiley's Market showing the defendant running to a gold sedan.  There were three 9-millimeter shell casings found near the victim and two found close to the side of the building, indicating the defendant fired multiple shots in more than one location.  There was eyewitness testimony that the defendant continued firing as he chased the victim through the parking lot.  There were multiple witnesses who testified that the victim identified the defendant as the person who shot him.  There was police testimony that when interviewing the defendant about the drive-by shooting at Edwards's house, he indicated the issue would be handled in the streets.  Lastly, officers did not find any weapons on the victim's person.

¶ 47    Therefore, we find that even without the defendant's recorded statements, the evidence strongly supported his conviction, and the admission of his statement was harmless error.

¶ 48    The defendant also argues on appeal that the trial court erred in denying his motion to suppress where he did not waive his *Miranda* rights prior to making incriminating statements to police.  However, in light of our conclusion that any alleged

17

constitutional error resulting from the court's denial of the motion to suppress was harmless, we need not further address this issue as it is moot.

¶ 49    Next, the defendant argues that the totality of the circumstances indicates that his confession was not voluntary and should have been suppressed.  Specifically, he asserts that his age, inexperience with law enforcement, lingering stress from the drive-by shooting at Edwards's house, and exhaustion all weighed in favor of suppression.  However, as this issue also relates to the admissibility of the defendant's statements, it is moot, and we need not address it.

¶ 50                              B. Ineffective Assistance of Counsel

¶ 51    Next, the defendant argues that he was denied effective assistance of counsel where counsel committed the following alleged errors.  Counsel misunderstood the elements of second degree murder and thereby neglected to assert the necessary element of imminent danger.  Counsel affirmatively misstated the law and did not thoroughly investigate all plausible options before deciding on a defense strategy.  He did not object on the proper grounds to Illinois Pattern Jury Instructions, Criminal, No. 24-25.09, the initial aggressor instruction.  He failed to offer Illinois Pattern Jury Instructions, Criminal, No. 24-25.09X, which would have explained that the defendant had no duty to retreat.  Counsel erroneously assumed the State would call certain witnesses and failed to send his own subpoenas.  Counsel did not file any motions or present evidence regarding the victim's multiple prior and pending charges, which would have suggested the victim had a violent character.  He did not present expert testimony regarding the defendant's age and environment and how that would affect his perceptions and behavior—

18

specifically, testimony on juvenile development, the defendant's individual characteristics, and his adaptive response to repeated exposure to gun violence. He did not preempt or object to the State's arguments and evidence that someone other than the victim shot at Edwards's house. He failed to object to the State's use of the term "gang" in reference to the defendant and his friends. He failed to object to the State's arguments that were unsupported by the evidence, specifically that the defendant stood over the victim and shot him at point-blank range while the victim was "begging for his life, dying" and "on the ground begging for mercy."

¶ 52 The defendant argues that the cumulative effect of counsel's errors made the defendant's claims of second degree murder less persuasive and that absent counsel's errors, there is a reasonable likelihood that he could have presented a successful defense of second degree murder, the lesser mitigated offense, which would have resulted in a shorter term of imprisonment. We disagree.

¶ 53 Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

Thus, the defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 54 Because a defendant must satisfy both prongs of the *Strickland* test, a failure to demonstrate either counsel's deficient performance or prejudice will defeat his claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). Thus, if it is simpler to resolve a claim of ineffective assistance of counsel based on the prejudice prong of *Strickland*, courts may do so. *People v. Ingram*, 382 Ill. App. 3d 997, 1006 (2008) (citing *Strickland*, 466 U.S. at 697). To demonstrate prejudice under *Strickland*, a defendant need only show that it is reasonably probable that a more favorable result would have been obtained absent counsel's unprofessional errors. *People v. Fletcher*, 335 Ill. App. 3d 447, 455 (2002). Here, we find that the defendant has failed to make this showing.

¶ 55 None of the errors or arguments raised by the defendant with regards to his trial counsel's representation indicates that the outcome would have been more favorable to him absent said errors. It is mere speculation as to what the effect of objections or additional witnesses would have had on the jury's finding that the defendant was not acting under an unreasonable belief in self-defense. The plain evidence, absent any error by counsel, would still have established that there was a drive-by shooting at Edwards's home, the defendant told Tomlinson the issue would be "handled in the streets," he was told that the victim was the shooter in the drive-by, he then went looking for the victim in a neighboring town, found him, snuck up behind him, opened fire, and then chased the victim through the parking lot while continuing to fire his weapon. That alone establishes the elements of first degree murder. The defendant does not point to any

20

misconduct by counsel that had an effect on the outcome. The defendant's argument at its core relies on the speculative assumption that had his counsel not committed the aforementioned errors, the jury would have found his defense more persuasive. This does not amount to prejudice, and we therefore conclude that the defendant was not denied effective assistance of counsel.

¶ 56                                    C. Excessive Sentence

¶ 57    Lastly, the defendant asserts that his 40-year prison sentence is unconstitutional, disproportionate, and excessive and requires either resentencing in the trial court or an order from this court reducing his sentence to the minimum term.

¶ 58    It is well settled that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. Generally, when a sentence falls within the statutory sentencing range for an offense, we may find an abuse of discretion only where the court imposes a sentence that is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). The trial court is given such deference because it is in a better position to consider, among other things, defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. at 209. A proper sentence balances the seriousness of the offense with the objective of restoring a defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11.

¶ 59    The defendant first asserts that his 40-year sentence followed by 3 years of MSR constitutes a *de facto* life sentence under the precedent established in *People v. Buffer*,

2019 IL 122327. *Buffer* involved a 16-year-old defendant who was sentenced to 50 years' imprisonment. *Id*. ¶ 1. In ruling that defendant's sentence constituted a *de facto* life sentence, the supreme court concluded that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Id*. ¶ 41.

¶ 60 Here, though the defendant was a juvenile at the time of the offense, he was not sentenced to serve more than 40 years in prison and therefore was not given a *de facto* life sentence.

¶ 61 Next, the defendant argues that, in determining his sentence, the trial court did not properly consider his rehabilitative potential, unreasonably determined that his crime was cold-blooded, and gave unwarranted weight to the "deterrence of others" factor, thereby abusing its discretion in sentencing him.

¶ 62 The trial court is in the best position for considering matters and making determinations related to sentencing and is therefore given wide discretion in making a reasoned judgment on the appropriate penalty according to the circumstances of each case individually. *People v. Brown*, 250 Ill. App. 3d 767, 774 (1993). A sentence within the statutory guidelines will not be disturbed on review unless it is manifestly disproportionate to the nature of the offense. *Id*.

¶ 63 Our review of the record indicates that the defendant's sentence was not an abuse of discretion. The court noted on the record several observations of the defendant that contradicted a potential for rehabilitation. The court noted that during his police interrogation, the defendant was calm and cool and showed very little emotion. He

referred to the victim as a "b***h," and his entire demeanor did not speak to a person capable of rehabilitation. Furthermore, the court opined that it had no way of knowing whether the defendant would hurt another individual in the future. Lastly, prior to announcing the sentence, the court listed everything it had taken into consideration in determining an appropriate term of imprisonment. Nothing in the record indicates that the court's considerations in sentencing the defendant constituted an abuse of discretion.

¶ 64    Lastly, the defendant contends that the record supports a minimum sentence based on his youth, lack of prior criminal history, troubled childhood, the fact that he was provoked prior to committing the offense, and an expert's opinion that he is capable of rehabilitation. However, he makes no refence to the trial court or how it abused its discretion with regard to these facts in determining the defendant's sentence. See *Etherton*, 2017 IL App (5th) 140427, ¶ 15. Therefore, we find no error.

¶ 65                        III. CONCLUSION

¶ 66    The defendant's conviction for first degree murder and sentence of 40 years' imprisonment to be followed by 3 years of MSR is hereby affirmed.


¶ 67    Affirmed.