THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRENT BATTLES, Defendant-Appellant.

Fifth District    No. 5—97—1103

Opinion filed February 1, 2000.

Richard J. Whitney, of Speir & Whitney, of Carbondale, for appellant.

Michael Wepsiec, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

The advent of DNA forensic technology in the late 1980s presented a dilemma for our legislators. On the one hand, the speedy trial statute forbad trial detention beyond 120 days without a trial. On the other hand, DNA evidence could take more than 120 days to generate.

The DNA analysis method exclusively in use at that time involved a test series that spanned several months. By the very nature of the method employed, any DNA testing was going to take a long time to complete. Moreover, several factors converged to assure significant delay before DNA testing could begin.

Normally, testing could not begin until after a suspect was in custody and time toward a speedy trial deadline was already running. The samples necessary for testing could not be harvested without a court order. Once the court-ordered samples were gathered, they had to be packaged and sent to one of a select few forensic labs that specialized in the new technology. These labs serviced DNA testing requests from all over the country. Their services were in high demand.

Thus, a confluence of circumstances present at the inception of DNA testing pressed the State's ability to develop DNA evidence in time for use at the trial of anyone being held in custody. It was clear that DNA testing might not be completed in time for use at a speedy trial setting, no matter how diligent an effort the State made to procure the tests results within the required 120-day time span.

■ Therefore, our legislature amended the speedy trial statute to accommodate use of DNA evidence that might otherwise be lost to a speedy trial deadline. In 1990, lawmakers added a sentence to the statute. Pub. Act 86—1210, eff. August 30, 1990. It empowers the State to hold a defendant in custody beyond 120 days without a trial where a diligent effort to obtain DNA evidence within 120 days fails. The amendment reads:

> "If the court determines that the State has exercised without success due diligence to obtain results of DNA testing that is material to the case and that there are reasonable grounds to believe that such results may be obtained at a later day, the court may continue the cause on application of the State for not more than an additional 120 days." 725 ILCS 5/103—5(c) (West 1994).

The original passage of this provision came at a time when testing labs were in short number and the methods those labs employed were slow. Yet, legislators did not provide a sanctuary from the normal speedy trial term for every case that involved, or potentially could involve, DNA testing. The amendment was designed for use only in those cases where a diligent effort to obtain DNA evidence within the 120-day term had proven unsuccessful. The State was not empowered to expand the normal speedy trial term without showing a diligent but failed attempt to secure DNA testing within the 120-day term. There was no refuge provided for cases where the need for additional time to conduct testing stemmed from the State's neglect or lack of effort.

We are presented a case where the State invoked section 103—5(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103—5(c) (West 1994)) to obtain refuge from an approaching speedy trial deadline. The State appeared 13 days prior to expiration of the 120-day statutory term and informed the court that it had requested DNA testing. The State asked for another 120 days within which to commence trial. On the 113th day of pretrial confinement, the trial court granted the State's request to hold defendant in custody without a trial for an additional 120 days. Consequently, the State maintained its hold on defendant's freedom while it awaited the outcome of DNA testing. Defendant remained in a Jackson County jail cell for 314 days without a trial.

When the State filed its motion to continue pursuant to section 103—5(c), defendant contested its use and insisted that trial commence as scheduled. Defendant claimed that the State failed to demonstrate a diligent effort to obtain DNA evidence in time for use at the impending trial. His argument proved to be of no avail.

Defendant renewed his complaint in a motion for discharge filed prior to the belated trial. In that motion, he claimed that the State's use of section 103—5(c) to delay proceedings deprived him of his right to a speedy trial. The motion reiterated defendant's earlier argument. Defendant challenged the trial court's finding that the State had made a diligent effort to obtain DNA testing before it employed section 103—5(c) to postpone trial. The argument failed again.

Defendant elected to proceed by way of a stipulated bench trial. He stipulated to the State's case, which included the DNA evidence developed during trial's delay. The trial court found defendant guilty of home invasion. Defendant currently serves a 20-year prison term imposed upon that finding.

There is only one issue preserved for review. We are asked to decide whether defendant received his statutory right to a speedy trial. Since defendant did nothing to delay trial during the first 197 days of pre-

trial confinement, the answer to this question resides in the State's use of section 103—5(c). If the State cannot rely upon its use as a sanctuary from the law's normal 120-day speedy trial term, trial's delay beyond 120 days at the State's behest would constitute a breach of the law's guarantee to a speedy trial.

At issue is whether the State made a sufficient showing that it exercised due diligence in its attempt to accomplish DNA testing within the 120-day speedy trial term. We examine what the State presented in support of the due diligence determination in order to unearth whether a basis exists for such a finding. We will not overturn a due diligence determination unless it amounts to a clear abuse of discretion. See *People v. Hughes*, 274 Ill. App. 3d 107, 111, 653 N.E.2d 818, 822 (1995).

The ultimate question for decision is whether the trial judge abused her discretion when she found that the State had established a diligent effort to procure DNA testing within the 120-day time frame that would have normally defined this defendant's statutory right to a speedy trial.

We turn to a closer examination of the events that led the State to delay trial beyond the 120-day speedy trial term in order to obtain DNA test results.

On the evening of December 18, 1996, Jack Trammel hosted a small party at his Carbondale home. He and his seven guests were rudely interrupted when three men sporting ski masks and bearing arms crashed the party. The intruders assaulted two of the guests during the armed robbery that ensued. The assaults drew blood and some of that blood splattered onto the assailants.

Jack Trammel escaped to a neighbor's home. He was able to summon the police while the crime was still in progress. The intruders made off with the partygoers' marijuana, an assault rifle, and $700 in cash. The intruders did not get far. As they departed the scene of the crime, the police arrived and gave chase. The ensuing escape attempt failed when the getaway car spun out of control and crashed. One of the suspects was able to run and did elude capture that evening.[1] The other two, defendant Brent Battles and Stanley Algee, were arrested as they exited the car.

There were bloodstains on the car's front seat and floor, on a ski mask removed from the car, and on the suspects' clothing. Two other ski masks were found on the side of the road along the attempted escape route. These items were turned over to the State crime lab,

---

[1]Marvin Gates was arrested after defendant cooperated, confessed, and implicated Gates as the missing suspect.

together with samples from the victims and the suspects. The following list chronicles the process by which these evidentiary materials found their way to the Carbondale State crime lab for testing.

December 20, 1996: The blood from the front seat of the getaway car and the bloodstained ski masks were delivered to the crime lab.

December 30, 1996: The defendant's bloodstained coveralls were delivered to the crime lab.

January 3, 1997: The blood samples were drawn from the two assault victims.

January 14, 1997: The State filed its motion for an order requiring the defendant to give blood, hair, and saliva samples.

February 4, 1997: After a hearing on the State's motion, defendant was ordered to provide the State with the requested samples.

February 6, 1997: The defendant's blood, hair, and saliva samples were gathered.

February 24, 1997: Defendant's samples were delivered to the crime lab.

All materials necessary to begin DNA testing were in the lab technicians' hands by February 24, 1997. However, Carbondale lab technicians could only perform standard blood analysis. They were not equipped to test for DNA matches. Any DNA work required transfer of the evidence to the State crime lab in Joliet, where there were two DNA lab technicians trained to conduct DNA testing.

On February 4, 1997, the trial court set this case for a trial on April 14, 1997. This setting allowed for almost all of the 120 days within which trial had to begin. The State had 117 days of the speedy trial term within which to complete blood, hair, and fiber analysis. The State knew that it had 72 of those days remaining in its effort to procure DNA test results in time for use at trial. The samples drawn from defendant remained at the Jackson County sheriff's department for 18 of those days.

On March 31, 1997, the State filed its motion to continue trial for 120 days. It relied upon section 103—5(c) and claimed that added time was needed in order to procure DNA test results. The State presented its motion on April 4, 1997, and six days later, the trial court composed a docket entry that allowed the request. The ruling was entered without findings. Since the continuance was allowed pursuant to section 103—5(c), the trial court must have found the exercise of due diligence to accomplish DNA testing during the 104 days of custody that preceded the request. It also must have found that a diligent effort to procure the tests within the time that remained on the speedy trial term would not meet with success. These implicit findings are what defendant challenges on appeal.

■ The speedy trial statute enforces a constitutional right. Therefore, the statute, including the provision at issue here, must be liberally construed in defendant's favor. See *People v. Reimolds*, 92 Ill. 2d 101, 106, 440 N.E.2d 872, 874 (1982).

The parties have not provided, nor have we found, a case that discusses what it means to exercise due diligence in the DNA-testing context. We have examined cases that explore the due diligence requirement that limits the State's use of section 103—5(c) to obtain 60-day extensions of the speedy trial term. We do not find them particularly helpful. Most of the cases deal with missing witnesses and the State's effort to find them in time for a trial setting. There is one case where a 60-day extension was granted to provide more time to procure lab reports. *People v. Durham*, 193 Ill. App. 3d 545, 550 N.E.2d 259 (1990). Defendant maintains that the case should control the outcome here. In *Durham*, we held that the State failed to establish due diligence because it "fail[ed] to show some effort or affirmative acts *** taken to obtain the desired evidence within the 120-day period for trial." *Durham*, 193 Ill. App. 3d at 546, 550 N.E.2d at 260. In *Durham*, we merely stated the obvious. A total absence of effort shows a lack of due diligence.

We know of no case that tells us what the State has to show in order to establish a diligent effort to complete DNA testing within the 120-day speedy trial term.

■ The word "diligence" is generally defined to mean prudence, vigilant activity, or attentiveness. See Black's Law Dictionary 544 (4th ed. 1968). The term "due diligence" means:

> "Such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard but depending on the relative facts of the special case." Black's Law Dictionary 544, 589 (4th ed. 1968).

Whether due diligence has been exercised is a question determined on a case-by-case basis after careful review of the particular circumstances presented. See *People v. Brown*, 47 Ill. App. 3d 616, 621, 365 N.E.2d 15, 19 (1977).

When confronted with a section 103—5(c) request, the trial court should anticipate a showing from the State that law enforcement authorities have made a prudent and assiduous effort to complete DNA testing before expiration of the 120-day speedy trial term. The State needs to show that it did what our legislature wanted done— that it made a serious attempt to accomplish testing in time to meet its primary speedy trial obligation.

■ The State bears the burden of proof on the question of due dil-

igence. See *People v. Smith*, 275 Ill. App. 3d 207, 215, 655 N.E.2d 1129, 1136 (1995). In order to meet this burden, the State should tender a full explanation of each and every step taken to complete DNA testing within the 120-day speedy trial term. The steps articulated should comprise a course of action that a reasonable and prudent person intent upon completing tests within 120 days would follow. Further, the showing should explain why the efforts engaged in fell short of their objective and resulted in an unavoidable need for delay.

The exercise of due diligence is measured by assessing the effort made to accomplish testing within the 120-day speedy trial term, not the effort made to complete testing in time for use at an earlier trial setting. See *People v. Smith*, 268 Ill. App. 3d 1008, 1013, 645 N.E.2d 384, 388 (1994). Thus, where section 103—5(c) is invoked to delay a trial scheduled to begin far in advance of the 120-day expiration date, the State should make a further showing that explains why continued efforts to procure DNA test results within the 120-day term would prove unsuccessful.

With these principles in mind, we examine what the State provided the trial court when it successfully pursued a 120-day trial delay. The State's motion to continue pled the following:

"1. This matter is currently set for trial on April 14, 1997 at 8:00 a.m.

2. The court has previously granted the People's Motion for Taking of Samples of Defendant Battles, Algee, and Gates.

3. Those samples were taken in a timely fashion and submitted to the crime lab for analysis. The most recent communication from the crime lab was received from Stacey Speith, Forensic Scientist on March 19, 1997.

4. Samples regarding hair and fibers have not yet been received from the crime lab. Blood comparisons will be done after the hair and fiber analysis.

5. Blood stains were recovered from the coveralls of Stanley Algee as well as the seat of the automobile in which the defendants were traveling the night in question. The People have requested DNA analysis to compare the blood stains found on the coveralls and the car seat to the samples submitted by the defendants and the victims in this matter. The crime lab has not yet conducted their basic blood work analysis comparison[;] no DNA testing has commenced by the crime lab.

6. Since no blood work comparisons or DNA blood work has begun, and the People have not yet received results of hair and fiber comparisons, the People are not prepared to go forward with this case on its current setting.

7. Chapter 725, Section 5/103—5 [*sic*] provides for an extension

of the speedy trial time upon request of the State for an additional 120 days to obtain the results of DNA testing.

WHEREFORE, the People respectfully pray this Court enter an Order pursuant to Chapter 725 Section 5/103—5 [*sic*] extending the speedy trial time for a period of 120 days and authorize continuing the trial setting of April 14, 1997."

Nothing in this pleading speaks to the effort made to obtain DNA testing before the delay was requested. It does not say what the State tried to do in order to complete testing either in time for use at trial or within the 120-day speedy trial term. There is no mention of what was done between February 24, 1997, and March 31, 1997, in order to procure, or attempt to expedite, DNA testing. The pleading lacks any factual assertion from which to infer a prudent and assiduous effort to complete DNA testing before section 103—5(c) was invoked to postpone trial.

The pleading does not provide a basis for the due diligence finding. However, on April 4, 1997, an assistant State's Attorney presented the motion and stated the following:

"Your Honor, *** each of the defendants is being held in the Jackson County Jail for speedy trial. The 120[-]day period would run either on April 16 or 17. The Speedy Trial Statute[,] [section] 103—5[,] does allow the People to ask for an additional time to try the defendants[,] that additional time being up to 120 days in a case where DNA evidence is to be sought.

*** [T]he People have requested that DNA analysis be performed on the blood stains, as well as for comparison purposes the samples which this Court has previously authorized.

I would note for the Court that with regard to *** Defendant Battles, there was a Motion for Samples granted on February 4, file-stamped February 5.

Your Honor, the samples were taken February 6, within one day, and they were transported to the Crime Lab within 13 days. In that 13[-]day period there were four days which were weekends. There was one day which was a holiday. And on February 11 there was a homicide which occurred that mandated the presence of detectives from the Jackson County Sheriff's Department to investigate.

Your Honor, the samples are at the Crime Lab as we speak. ***

The samples—that being the coveralls, ski masks[,] and seat samples which have been submitted to the Crime Lab—have been submitted to the Hair and Fiber Section of the Crime Lab in Carbondale. They are currently conducting their analysis. After they are completed, those samples will then be transferred to the Serology Section of the Crime Lab in Carbondale for their preliminary

analysis, and then the blood and the blood stains will be transferred to the State Crime Lab in Springfield for DNA analysis and comparison.

It is anticipated that the DNA will take anywhere from eight to twelve weeks once it's received in Springfield. I cannot give the Court a more accurate figure than that. The Crime Lab in Springfield is doing quite a number of DNA analyses, especially in light of the problems of the Cellmark Labs and some other private laboratories. The Springfield Crime Lab is the only agency doing DNA analysis in criminal cases in the state of Illinois, and they are quite backlogged at this point in time.

I cannot tell the Court that the DNA will be done within twelve weeks; however, it may take longer than that. And that's why, in this circumstance, I'm asking the Court to continue the matter for 120 days from the current trial setting, and [I] ask for the extension of the speedy trial time pursuant to statute."

These comments lack any mention of the effort made to obtain DNA test results either in time for use at the impending trial or within the 120-day speedy trial term. They do not articulate a course of action that a reasonable and prudent person intent on obtaining DNA test results within 120 days would follow. The comments made in support of the motion to continue fail to augment the pleadings with any information from which to infer that authorities made a serious effort to complete DNA testing within the 120-day speedy trial term.

The State clings to the only two comments that in any way refer to an effort or a reason why an effort might have failed. We are directed to the assistant State's Attorney's mention of the fact that authorities promptly gathered samples and delivered them to the crime lab. The State relies upon these comments, coupled with mention of the fact that the crime lab was "quite backlogged," to support the finding of due diligence.

Initially, we are not particularly impressed with the effort authorities made to deliver the samples to the lab. By our count, they wasted 18 days that might otherwise have been used to complete testing. Notwithstanding weekends, holidays, and homicides, transport of the samples from the Jackson County jail to the Carbondale crime lab was a task someone could have performed in a matter of minutes.

However, the State's reliance upon the effort made to deliver the samples to the crime lab is misplaced. Standing alone, rapid retrieval of testing materials and delivery of those materials to a crime lab for testing is not enough to show a prudent and assiduous effort to complete DNA testing within the 120-day speedy trial term. If the State gathered and delivered everything needed for DNA testing on the day of arrest, but thereafter crime lab technicians stood idly by

and ignored those materials for 120 days, if the State did not even try to test the materials within the 120-day speedy trial term, a court would be hard-pressed to find that authorities pursued a course that a reasonable and prudent person intent on procuring DNA tests within 120 days would follow.

We believe that the State should have provided the trial court with an account of what transpired after the samples were delivered to the crime lab. It should have addressed those things that were done in an attempt to promote, or expedite, the testing of the materials after their delivery to the lab.

The comment that Springfield's crime lab was "quite backlogged" does not permit us to conclude that diligent efforts to complete testing were unavoidably frustrated by the lab's workload. Some kind of testing backlog will always exist. The State needed to explain more than its mere existence. It needed to explain what reasonable and prudent effort was made to deal with that backlog and why the backlog hampered the effort to complete the particular testing at issue. The trial court was left to wonder whether the State even asked a crime lab technician to begin testing at any time prior to the request for continuance.

We cannot eliminate the exercise of due diligence as a prerequisite to an extension of speedy trial constraints. If the mere assertion of a backlog's existence could constitute reason enough for use of section 103—5(c), its 120-day extension would become automatic. A showing of due diligence would become a thing of the past.

■ We find that the information conveyed to and possessed by the trial court at the time of its ruling did not support a due diligence determination. However, we would add that even if the statements made could support such a finding, those statements proved to be inaccurate.

In its brief, the State points out in a footnote that the assistant State's Attorney mistakenly informed the court that the crime laboratory conducting DNA analysis was located in Springfield, when in fact it is located in Joliet. This mistake is not as insignificant as its treatment might suggest.

The assistant's remarks to the trial court leave the distinct impression that the information conveyed came from sources at the State crime lab. He told the court:

> "It is anticipated that the DNA will take anywhere from eight to twelve weeks *once it is received in Springfield.* I cannot give the court a more accurate figure than that. *The Crime Lab in Springfield is doing quite a number of DNA analyses*, especially in light of the problems of the Cellmark Labs and some other private labora-

tories. The Springfield Crime Lab is *the only agency doing DNA analysis* in criminal cases in the state of Illinois, and *they are quite backlogged* at this point.

I cannot tell the court that the DNA will be done within twelve weeks; however, it may take longer than that.'' (Emphasis added.)

The assistant had to have acquired this information from someone in the State crime lab. We would expect that a prudent person trying to obtain DNA testing would talk with crime lab personnel whose services were necessary to complete DNA testing, personnel who understood what kind of workload they labored under, and personnel who could provide a reasonable estimate of the time needed to complete testing. Had the assistant pursued such a course we would expect him to know where the DNA samples had to be delivered in order to be tested. Conversely, personnel at the State crime lab should be able to tell a prosecutor's office where it needs to send DNA samples for testing, particularly where there is only one lab in the State that engages in it. Those personnel should also be able to convey a reasonably accurate estimate of how long tests will take to perform once samples are received by the lab.

Here, the Joliet DNA lab technician did not receive test samples for well over a month after the continuance was granted. When the lab received those samples, the continuance had provided what was believed to be ample time before the statute would run. Therefore, we assume that the tests were performed without any sense of urgency or request for priority.

The DNA testing commenced on June 4, 1997. The record reveals that the State disclosed results of the DNA testing to the defense on June 26, 1997. The actual testing took less than 22 days. Once the samples were received at the Joliet lab, the lab technician dealt with whatever backlog in requests existed, performed DNA testing on seven items, prepared a written report of the completed tests, and had it in the prosecutor's hands in considerably less time than the 8- to 12-week estimate conveyed to the court.

When the State submitted its motion to continue for decision, it failed to present anything from which to infer that a diligent effort had been made to complete DNA testing within the 120-day speedy trial term. It was impossible for the trial court to determine what kind of effort was made. The trial court was simply not told of that effort. Accordingly, we conclude that the trial court abused its discretion when it found that the State had exercised due diligence to obtain DNA testing before it invoked section 103—5(c) to delay trial. The State cannot rely on the statute's refuge from the normal speedy trial term. Hence, we conclude that defendant did not receive his statutory right to a speedy trial.

The State invites us to consider matters raised after the motion to continue was presented and ruled upon—matters brought up during argument at the motion for discharge. These matters are not pertinent to the inquiry. Whether the trial court abused its discretion when it determined the exercise of due diligence is a question reviewed by an examination of what information the court had before it when it made its finding. When a defendant challenges the trial court's extension of a 120-day deadline, we are required to examine the record as it existed at the time of the motion. See *Hughes*, 274 Ill. App. 3d at 111, 653 N.E.2d at 822.

Although matters brought to light during argument on the discharge motion cannot guide the outcome in this case, we think that one of those matters warrants attention.

At the motion for discharge, the State revealed a different reason for its failure to procure the tests in time for use at trial. The assistant State's Attorney who presented the motion to continue addressed the discharge motion differently. He revealed that a backlog had not frustrated completion of testing within the speedy trial term. In reality, it was a delay in the decision to test that prevented timely completion of DNA testing:

> "This case originally did not fit the crime lab profile for a DNA case because it did not involve a homicide or a sexual assault. As a result, it took some time going through the various levels from the crime lab to Springfield and back to get what is essentially a waiver in this case to determine that they would in fact make an exception and do DNA analysis in this case. It took several weeks for the bureaucracy to move in this case. That is not Mr. Battles' fault and I would not submit that that is Mr. Battles' fault. However, these are necessary steps that had to be taken for this case to be considered for DNA analysis by the Illinois State forensic lab. *When it became apparent that they would accept or consider accepting these exhibits for DNA analysis, that's when the motion was filed for the additional 120 days.*"

The assistant went on to explain that conventional testing was postponed to preserve samples for DNA testing:

> "[C]onventional testing would have been *** destructive testing; it would have destroyed the entire sample, thereby leaving none of the sample available for DNA analysis. The conventional testing was held off to await this Court's determination whether DNA analysis would be allowed and the delay would be allowed for the purposes of DNA."

Thus, we learn that most of the original 72 days available to the State to complete forensic work were consumed in a debate over whether DNA tests would ever be performed. The prosecution put

conventional testing on hold while it awaited word from a State agency on whether it would break with protocol and do the testing. The State did not decide to test for DNA evidence until March 31, 1997.

There was good reason why the State's motion to continue and the prosecutor's comments in support of it failed to explain the effort made to complete DNA testing within the 120-day speedy trial term. The State did not explain its effort because there was none. The State did nothing to process the blood delivered to the crime lab prior to invoking section 103—5(c). It took the State 103 days of defendant's pretrial confinement to decide whether to test for DNA matches. Once the decision to test was reached, the State did not attempt to test in the remaining time available. There was no effort to expedite DNA testing. Instead, the State chose to forestall all testing and invoke section 103—5(c).

The State did not use section 103—5(c) as a refuge from an approaching deadline after a diligent but failed effort to obtain tests in time for use at trial. Rather, it used section 103—5(c) as a vehicle to cure the time problem created by its *lack* of effort. The State could not complete DNA testing within the 120-day speedy trial term because the State never attempted to test.

The State could have taken immediate steps to commence testing when it reached its decision to do so. If the tests were not finished by April 14, 1997, at least the State would have made some effort to complete testing within the 120-day speedy trial term. Instead, the State chose to rely on the haven provided by section 103—5(c) at a time when it had done nothing to meet its prime prerequisite.

The State views the situation differently. It maintains that the prosecutor's effort to obtain a waiver of the State crime lab's testing protocol constituted a diligent effort to obtain DNA testing within the 120-day speedy trial term. The merit of this position does not have to be reached, for it was never presented in support of the motion to continue. Nonetheless, the State's position deserves comment.

We recognize that there are cases where, for good reason, the State will not decide to test for DNA evidence until considerable time has already run on the 120-day term—cases where evidentiary materials necessary to test for DNA evidence are not uncovered until well into that term. That is not the case here.

In light of the due diligence requirement, a belated decision to test for DNA evidence must be reasonable in its particulars. Were we to decide this question, we would not find it very reasonable for the State crime lab to ponder a policy waiver for 104 days of pretrial detention. Nor would we find the exercise of due diligence in a prosecutor's inability to persuade a State crime lab to break with policy for almost

the entire speedy trial term. The limited sanctuary that section 103—5(c) provides is not an entitlement, available to hold defendants for another 120 days from whatever moment in time the State decides to abandon protocol and test for evidence.

We cannot accept a view that would allow the State to arbitrarily decide to perform DNA testing on the 120th day of a speedy trial term, invoke section 103—5(c) on the day of decision, and thereafter hold a defendant 240 days without a trial. Were we to do so, the legislature's call for a serious effort to complete DNA testing within the 120-day speedy trial term would be entirely abrogated.

There have been dramatic advances in the methods employed to analyze DNA since the passage of section 103—5(c). As this case demonstrates, the State is no longer shackled to a test series that spans several months. The circumstances that gave rise to section 103—5(c) are not what they once were. We believe that if authorities pursue a prudent and reasonable course and are assiduous in their efforts, the 120-day extension provision found in section 103—5(c) should find rare use. Here, the State waited 104 days before deciding to test. But had the State made an effort to test as soon as it decided to do so, and acted with the April 14, 1997, trial deadline in mind, it is conceivable that DNA testing could have been completed in time for use at trial; it is conceivable that the State could have met its primary speedy trial obligation.

For the reasons stated, we reverse defendant's conviction.

Reversed.

CHAPMAN and HOPKINS, JJ., concur.