NOTICE

Decision filed 12/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231221-U

NO. 5-23-1221

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 23-CF-206 |
| | ) | |
| ROLANDER HAMPTON, | ) | Honorable |
| | ) | Ramona M. Sullivan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Cates and Justice Hackett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Sufficient evidence supported defendant's conviction and sentence for attempted first degree murder. Defendant's claim of a speedy-trial violation is waived, and his alternative claim of ineffective assistance is denied. The State's closing remarks were not improper, and we decline to consider the defendant's claim of ineffective assistance on the matter.

¶ 2   Following a jury trial in the circuit court of Champaign County, defendant, Rolander Hampton, was convicted of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2022)) and attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)). Defendant in this direct appeal challenges his convictions, arguing that (1) the State presented insufficient evidence to support his conviction of attempted first degree murder, (2) he was denied his statutory right to a speedy trial when the State failed to demonstrate due diligence in obtaining DNA evidence, and (3) the State

1

shifted the burden of proof and argued facts not in evidence during closing arguments. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The facts necessary to our disposition of this appeal are as follows. On February 22, 2023, defendant was arrested, and on February 23, 2023, he was arraigned on charges of attempted first degree murder and aggravated battery with a firearm, following a shooting that occurred on January 3, 2023, at the victim, Paul Penny's, apartment. At the arraignment, defendant waived his preliminary hearing, entered a plea of not guilty, and demanded a jury trial. Defendant was then held in custody for the duration of his case while it was pending trial.

¶ 5    On March 28, 2023, a continuance was granted by agreement of both the State and the defense from March 28 to April 26, 2023, which extended the speedy-trial date by 29 days. At the April 26, 2023, pretrial hearing, the circuit court heard the State's uncontested motion to compel the taking of buccal swabs for DNA testing and comparison. At the hearing, the State also sought a motion to continue to obtain the DNA evidence; over objection, the circuit court granted the motion to continue until May 24, 2023.

¶ 6    On May 22, 2023, the State filed a motion to continue, indicating that it was "in the process of obtaining evidence from the Illinois State Police Forensic Sciences Laboratory in Springfield, Illinois (State Lab), specifically, a forensic comparison of a known standard of Defendant's DNA with swabs of items from the victim's apartment." In the motion the State highlighted that "[o]n May 12, 2023, a known standard from Defendant was transported to the State Lab, along with several items (a lighter, cigar tips, and a swab from a cup) to be tested." However, as the State noted, as of May 22, 2023, the testing of the items was not yet complete. The State further indicated in the motion that it had exercised due diligence in obtaining the DNA evidence and that there

were "reasonable grounds to believe that said evidence [would] be available at a later date," but it would "not be completed within the normal 120 day statutory speedy trial period." The circuit court held a hearing on May 24, 2023, where it addressed the State's motion to continue. The defense objected to the State's motion, arguing that defendant was ready for trial and that the results of the DNA testing should be back ahead of defendant's trial date. The circuit court, over the defendant's objection, found "the State has shown good cause" and granted the motion, "including the additional time authorized by the statute." The cause was continued to the next pretrial date on June 28, 2023.

¶ 7 On June 7, 2023, the State filed count III, charging defendant with the attempted first degree murder of Tamika Baker. 720 ILCS 5/8-4(a), 9-1(a) (West 2022). On June 13, 2023, the defendant was arraigned on count III, pled not guilty, and demanded trial by jury. The State then filed a motion to continue on June 27, 2023, which the circuit court granted over defendant's objection, continuing the case until July 26, 2023.

¶ 8 On the July 26 hearing date, the State filed an additional motion to continue. The continuance was granted over defendant's objection, continuing the case until August 30, 2023. At the August 30, 2023, setting, both the State and the defense stated that they were ready for trial.

¶ 9 On October 17, 2023, 33 days before the speedy-trial date, defendant was brought to trial. During the trial, the State first called Baker, who testified that around 11:30 p.m. on January 3, 2023, she arrived at Penny's apartment and that a man she did not know was also there. Baker identified the man she had seen as defendant.

¶ 10 Baker stated that a short time later, the three began drinking in Penny's apartment. While drinking, defendant brought up the topic of social clubs. Baker indicated to defendant that she was a member of a social club, at which point defendant's demeanor shifted and he appeared

3

"aggravated" or "upset." Defendant told Penny that Baker "wasn't who he thought [she] was," and that "it wasn't anything for him to put in a call and have somebody come through [Penny's apartment] and kill everybody up in [the apartment]."

¶ 11   Baker testified that Penny then tried to de-escalate the situation by reminding defendant that he was there to make music with Penny. Defendant then approached Penny and lifted his shirt to show his back tattoo and said, "they kill n*** in they sleep" and "it ain't nothing for [defendant] to put in a call and have [the apartment] wiped the f*** out."

¶ 12   Baker stated that the defendant then approached Baker and asked for her name and the name of her social club, which Baker refused to answer. At her refusal to answer the questions, defendant then became "very, very angry," and Penny asked defendant to leave. Baker stated that defendant continued to say that Baker was not who she said she was, and Penny began to approach defendant, who was moving in the direction of the door. When nearing the door, defendant then said, "Before I go I'm telling you this b*** ain't who she say she is." Penny continued towards defendant, who was near the door, reiterating that defendant needed to leave. Defendant then shot Penny, who fell to the floor.

¶ 13   Baker testified that after defendant shot Penny, he rushed towards her, put his gun to her head, and said, "B***, if you breathe or you move, I'll blow your face off." Defendant, standing over her, continued to say, "B***, you wish you would have told me who you were now, don't you, b***?" Defendant then asked Baker her name again, to which she did not respond. Defendant then pulled the trigger of the gun pointed at Baker; the gun failed to fire. Defendant then pulled the trigger of the gun again, which failed, before moving towards the door of Penny's apartment.

¶ 14   Baker testified that as she tried to assist Penny, defendant quickly returned to the apartment and held the gun to her head again and said, "B***, I told you not to move." Soon after, defendant

4

took one of Penny's phones and left, at which time Penny told Baker to "[l]ock the door, and call 911." Baker stated that when defendant left, she heard two gunshots from the front of the apartment building.

¶ 15 On cross, Baker testified that she initially spoke with officers after the incident but gave an additional interview with Detective Petrilli about the shooting in May 2023. Baker said she provided additional details about the shooting to Petrilli at that meeting because "more things kept coming back" to her. Defense counsel asked if one of the additional details was that the defendant put a gun to her head and pulled the trigger. Baker responded no, she had told police that when she spoke to them shortly after the incident.

¶ 16 Penny then testified that on January 3, 2023, he was with Baker and the defendant at his apartment talking, listening to music, and drinking. Penny stated that they talked about the neighborhoods they were from in Chicago, and defendant had asked Penny if he had a gun, to which he answered no.

¶ 17 Penny further testified that later on in the night, defendant was speaking to someone on his phone about a biker club, and Baker mentioned that she knew a lot of biker clubs and was part of a chapter. Penny stated that defendant "got a little more aggressive" and was upset speaking with Baker because he did not believe that she was part of a biker club. Penny stated that defendant asked the person on the phone if they knew Baker, and when they said no, defendant became "upset more and more" as the conversation continued. Penny said that defendant was asking Baker several questions about her chapter as he continued to talk "louder and stronger," and accused Baker of lying about her association.

¶ 18 Penny said that as defendant got angrier, Baker moved away from the defendant and sat closer to Penny, who was on the couch. After Baker moved, defendant approached her and placed

his phone, which was on a FaceTime call, directly in front of her face. Baker asked defendant to stop, but he continued to raise his voice. At that point, Penny told defendant that he needed to lower his voice or go across the hall to his home. Defendant then said to Penny, "You don't even know the b*** you around." Penny testified that in response to defendant's comment, he stood up, and that was when defendant shot him. Penny stated that defendant was about "ten feet" from him when defendant shot him. As a result of his injuries, Penny testified that he had to have two different surgeries.

¶ 19    The State called multiple law enforcement officers to testify. Officer Andrew Wilson testified that he rode in the ambulance with Penny, and while traveling to the hospital, an EMT found a bullet on the cot that Penny was lying on, near a wound on his lower back that appeared to be an exit wound. James Warren, a former detective for the Champaign Police Department, testified that when he arrived at Penny's apartment, he saw that Penny had a gunshot wound on the right side of his abdomen. Penny told Warren at the scene that the person who shot him was "the guy across the way." Warren stated that he "tried to get [Penny] to elaborate multiple times" on who shot him. However, at the time, Penny was "having a hard time maintaining a coherent thought," and was vomiting repeatedly.

¶ 20    Officer Blake Wehling testified that he spoke with Baker on scene at the apartment. Wehling stated that Baker appeared to be "emotional" and "distracted" during their conversation. At one point in the conversation, two loud noises came from the hallway outside the apartment, and Baker became very frightened and began crying. Wehling also testified that Baker told him that after defendant shot Penny, he "pointed the pistol at her." On cross, Wehling stated that Baker said nothing to him about the defendant pulling the trigger of the gun.

¶ 21    Detective Amy Petrilli testified that she spoke to Baker at the hospital a few hours after the shooting and again several months later. Petrilli stated that she was told by Baker that defendant pointed a gun at her. During their second conversation in May 2023, Baker said to Petrilli that defendant had put the gun to Baker's head and pulled the trigger twice. On redirect, Petrilli affirmed that it is not unusual for officers to get more information from witnesses involved in traumatic incidents as a case proceeds.

¶ 22    Detective Lauren Hill testified that Baker identified defendant in a photo lineup as the shooter. Hill stated that when Baker saw the photos, she became fearful, pointed at a photo, began crying, and curled up into a ball. Hill identified defendant in court as the person Baker identified as the shooter in the photo lineup. Over the defense's objection, a video of the photo lineup procedure was admitted into evidence and shown to the jury.

¶ 23    The State called crime scene technician Nathanael Epling and forensic scientist Aaron Small to testify. Epling testified that he collected evidence from Penny's apartment. He testified to the contents of several photos, including one depicting a shell casing on the floor of the apartment and one of a table with two red cups on it. He also testified as to how swabs from the two red cups were taken and stored for DNA analysis. Small testified that he compared DNA samples from a cup found on a table in Penny's apartment and DNA taken from defendant. Small testified that the analysis showed it was 77 octillion times more likely that the DNA on the cup originated from defendant rather than from an unknown individual. Small also stated that the bullet casing was not tested for DNA because the testing availability was only in the pilot stage and was only available to Illinois State Police cases. The defense did not present any evidence or call anyone to testify. However, the defense moved for a directed verdict, arguing that the State failed to prove defendant guilty beyond a reasonable doubt of all charges, which was denied.

¶ 24 Before closing arguments began, the trial court told the jury that if a lawyer "says something that's not based on the evidence or reasonable inference that could be drawn from that evidence," then, they, the jury, should disregard that statement. In closing, the State asked the jury to find defendant guilty of the charged offenses. The State argued that Penny being shot was the only plausible explanation for Penny's injuries.

¶ 25 The State also highlighted the consistency between Baker's statements and the evidence that was presented to the jury, including Baker's description of defendant's large back tattoo, which was photographed and shown to the jury. Regarding Baker's statement to police in May 2023, the State told the jury that Baker added a detail she remembered, that defendant pulled the trigger rather than just pointing the gun at her. The State argued that this was not an inconsistency, but rather just additional information.

¶ 26 Defense counsel argued that the State presented no other evidence aside from the testimony of Penny and Baker, showing that defendant was the shooter. Defense counsel questioned the credibility of Penny and Baker, stating that Penny did not immediately identify defendant to the police and Baker changed her account of the shooting. Defense counsel highlighted that the DNA found on the cup only proved that defendant was, at one point, in Penny's apartment. Further, defense counsel argued that no DNA testing was done for the bullet or casing recovered from the scene.

¶ 27 In its rebuttal, the State argued that there was no credibility issue with Baker's testimony; she knew about defendant's tattoo, she told police where they would find his DNA evidence on the table, and she knew where defendant was standing when Penny was shot, which matched where the shell casing was found. The jury convicted the defendant of aggravated battery and the

attempted first degree murder of Penny. He was acquitted of the attempted first degree murder of Baker.

¶ 28    Defendant's sentencing hearing was held on November 30, 2023. At sentencing, the defendant first argued a motion to reconsider, a motion for acquittal, or, in the alternative, a motion for a new trial, all of which the trial court denied. The court merged the aggravated battery conviction and sentenced the defendant to 31 years' imprisonment for the attempted murder of Penny. Thereafter, defendant filed a timely notice of appeal.

¶ 29                                    II. ANALYSIS

¶ 30                           A. Sufficiency of the Evidence

¶ 31    Defendant argues that the State failed to prove him guilty of attempted first degree murder beyond a reasonable doubt because the evidence at trial did not establish that he acted with the specific intent to kill Penny. Defendant suggests that this court should reduce his attempted murder conviction to the merged offense of aggravated battery and remand for sentencing on that count. In response, the State maintains that the evidence was sufficient to sustain defendant's conviction and that defendant's intent to kill can be inferred from his actions. We agree with the State and accordingly affirm the judgment finding defendant guilty of attempted first degree murder.

¶ 32    "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. This court will not reverse a conviction on sufficiency grounds unless the evidence was so "unreasonable, improbable, or unsatisfactory" that, even when viewed in the light most favorable to the State, no rational trier of fact could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*,

9

443 U.S. 307 (1979). The findings made by the trier of fact regarding the credibility of witnesses, the inferences to be drawn from the evidence, and the resolution of conflicts in the evidence are all entitled to significant deference. *Ross*, 229 Ill. 2d at 272. We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). Circumstantial evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 33    To sustain a conviction for the offense of attempted murder, the State must prove that (1) the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the killing of an individual, and (2) the defendant, or one for whose conduct he is legally responsible, did so with the intent to kill an individual. 720 ILCS 5/8-4(a), 9-1(a) (West 2022).

¶ 34    "Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances including the character of the assault, the use of a deadly weapon and other matters from which an intent to kill may be inferred." *People v. Maxwell*, 130 Ill. App. 3d 212, 216 (1985). This intent "may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life." *People v. Winters*, 151 Ill. App. 3d 402, 405 (1986). "It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears there exists a reasonable doubt as to the defendant's guilt." *Id.* at 406.

¶ 35    We turn to the question of whether the State presented sufficient evidence to prove defendant had the requisite specific intent to kill Penny, and we find the evidence was sufficient. We are not persuaded by defendant's argument that the State failed to establish the requisite

10

specific intent because the State failed to demonstrate that defendant threatened Penny or failed to establish that the injuries Penny sustained were life-threatening. Additionally, defendant argues that the State failed to prove specific intent because the evidence demonstrated that defendant "had the opportunity to kill Penny, but did not."

¶ 36    The evidence presented at trial showed that defendant was with Penny and Baker inside Penny's apartment on January 3, 2023, the night of the shooting. The evidence demonstrated that defendant became increasingly hostile towards Baker, and Penny ultimately asked defendant to leave. Defendant stood near the door, about "ten feet" from Penny, pointed a gun at Penny, and shot him in his torso. Thereafter, defendant fled the apartment, leaving Penny to bleed out on the floor. As a result of the injuries, Penny had two different surgeries.

¶ 37    Contrary to defendant's argument, countless cases have determined that a fact finder can reasonably infer an intent to kill from evidence that a defendant fired a gun in the direction of a person. See *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978) ("The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill."); *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (a fact finder could reasonably infer an intent to kill "from the act of firing two bullets in the direction of an occupied car and a crowded street"); *People v. Green*, 339 Ill. App. 3d 443, 451-52 (2003) (a jury could reasonably infer an intent to kill based on evidence that the defendant fired a pistol multiple times in close range in the direction of officers occupying a vehicle, even though the defendant missed the officers); see also *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (sufficient evidence to prove a specific intent to kill existed when defendant fired a gun down a breezeway while people ran away). Here, the testimony demonstrated that defendant pulled out a gun and shot Penny at close range, in his torso, containing his vital organs. See *Jackson*, 2020 IL 124112, ¶ 70 ("Trier of fact is not required to disregard inferences

11

that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.").

¶ 38    The facts, when viewed in the light most favorable to the prosecution, are adequate to sustain a conviction for the attempted first degree murder of Penny. A reasonable juror who considered the evidence presented could find beyond a reasonable doubt that defendant specifically intended to fire a dangerous weapon at Penny. "Evidence that a defendant discharged a firearm in the direction of another individual, either with malice or total disregard for human life, is sufficient to support a conviction for attempted first degree murder." *People v. Johnson*, 331 Ill. App. 3d 239, 251 (2002). Thus, the evidence taken together supports the jury's verdict. *People v. Evans*, 209 Ill. 2d 194, 209 (2004) ("[T]he trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt.").

¶ 39                                B. Speedy-Trial Violation

¶ 40    Next, defendant argues that the trial court erred in granting the State's motion to continue regarding the DNA evidence and in finding that the State exercised due diligence in trying to procure the lab results before the original trial setting, thus, resulting in a violation of the defendant's speedy-trial rights. In the alternative, he argues that defense counsel was ineffective for failing to preserve this issue in a posttrial motion. Defendant acknowledges that this issue was not properly preserved by failing to raise it before the trial court, but he seeks review under the first prong of the plain error doctrine. The State responds that defendant waived the issue because defendant failed to file a written motion to dismiss based on an alleged speedy-trial violation before trial and cannot now seek plain error review. Additionally, the State maintains that it had exercised due diligence and that there was no violation of the defendant's speedy-trial rights. Furthermore,

the State asserts that defendant cannot satisfy the first prong of plain error or the ineffective assistance of counsel standards.

¶ 41    We begin our analysis by considering the State's position, relying on *People v. Marcum*, 2024 IL 128687, asserting that, defendant waived his speedy-trial argument by failing to file a discharge motion prior to trial. Under Illinois law, a defendant must make a pretrial motion to dismiss the case for a statutory speedy-trial violation "within a reasonable time after the defendant has been arraigned." 725 ILCS 5/114-1(a)(1), (b) (West 2022). "Any motion not filed within such time or an extension thereof shall not be considered by the court and the grounds therefor *** are waived." *Id.* § 114-1(b).

¶ 42    In *Marcum*, the defendant did not file a pretrial motion to dismiss on statutory speedy-trial grounds, but argued that review was available under the plain error doctrine. *Marcum*, 2024 IL 128687, ¶ 27. The court in *Marcum* concluded that "[c]onsistent with the long-held application of waiver in our case law, section 114-1 of the Code expressly states that a violation of section 103-5 is *waived* unless a motion for discharge is made *prior* to trial." (Emphases added.) *Id.* ¶ 41. Moreover, the court acknowledged that "the legislature would not have provided for waiver of the speedy-trial statute if a violation of that statute alone resulted in an unfair trial or challenged the integrity of the judicial process." *Id.* Thus, the court determined that "a violation of section 103-5 does not alone constitute plain error." *Id.*

¶ 43    Here, though the defendant objected at the time the trial court granted the State's motions to continue, the defendant did not ultimately challenge those rulings in a motion to dismiss by arguing they resulted in a violation of the defendant's statutory speedy-trial rights prior to trial. Instead, the defendant proceeded to trial without claiming that he should be discharged. As explained in *Marcum*, " 'it was long ago established that the right to discharge granted by the

13

statute was *waived* if not asserted by the defendant prior to conviction.' " (Emphasis in original.) *Id.* ¶ 31 (quoting *People v. Pearson*, 88 Ill. 2d 210, 216 (1981)). Further, defendant did not file a posttrial motion preserving the alleged speedy-trial violation. At no point was the trial court presented with the opportunity to address whether a violation of the defendant's speedy-trial rights occurred.

¶ 44    In his reply brief, defendant attempts to distinguish his claim, arguing that in *Marcum*, the defendant sought review under the second prong of plain error; in contrast, defendant here seeks review under the first prong of plain error. We find this argument unpersuasive. The plain error rule bypasses normal *forfeiture* principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Though forfeiture may be a limitation on the parties, and not this court, we have never stated that the same is true of waiver. *People v. Ratliff*, 2024 IL 129356, ¶ 26. The *Marcum* court, quoting *Pearson*, 88 Ill. 2d at 216, explained the right conferred by section 103-5 was " 'not absolute in the sense that the mere passage of time ousts the court of jurisdiction to try the accused and makes his release mandatory.' " *Marcum*, 2024 IL 128687, ¶ 31. The right to discharge could be waived, and is waived, when the accused fails to raise the question prior to conviction. *Id.* ¶ 40. We find that *Marcum* is controlling and consistent with the long-held application of waiver in our case law. Section 114-1 of the Code of Criminal Procedure of 1963 expressly states that a violation of section 103-5 is *waived* unless a motion for discharge is made prior to trial. *Id.* ¶ 41. Thus, the defendant has waived the issue.

¶ 45    Alternatively, the defendant argues on appeal that trial counsel was ineffective for failing to preserve his statutory speedy-trial issue for appeal. Specifically, he argues "trial counsel was ineffective because, though he objected to each of the State's motions to continue, he failed to

raise the speedy-trial violation in a posttrial motion." To prevail on a claim of ineffective assistance of counsel, a defendant must establish both deficient performance and prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel was ineffective, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant. *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 46    A statutory speedy-trial claim under section 103-5(a) must be asserted before trial through a motion to dismiss. 725 ILCS 5/114-1(a)(1) (West 2022). As the record shows, although the defendant initially objected to the State's continuances to obtain DNA evidence, on August 30, 2023, defense counsel affirmatively agreed to a trial date outside the statutory period and never filed a pretrial motion to dismiss under section 114-1(a)(1) of the Code of Criminal Procedure of 1963 (*id.*). Counsel also did not raise the issue in a posttrial motion. Under section 114-1(a)(1) and (b), a statutory speedy-trial claim must be raised pretrial to preserve it otherwise it is waived; a posttrial motion cannot cure the failure to object or move for dismissal prior to conviction. As stated in *People v. Cordell*, 223 Ill. 2d 380, 390 (2006), "[s]hould a defendant wish to employ section 103-5(a) as a shield against any attempt to place his trial date outside the 120-day period, he is free to do so. To allow section 103-5(a) to be used as a sword after the fact, to defeat a conviction, however, would be contrary to our holding in [*People v.*] *Gooden*[, 189 Ill. 2d 209 (2000)] and allow defendants to use a procedural loophole to obstruct justice." *Cordell* illustrates that a defendant is obligated to object when the trial court sets a date outside the speedy-trial term and emphasizes that section 103-5(a) is a shield, not a sword, but it does not alter the procedural requirement to file a pretrial motion under section 114-1(a)(1).

¶ 47　　Because defendant's statutory speedy-trial claim was waived before trial and therefore waived for purposes of appellate review under *Marcum*, 2024 IL 128687, counsel's failure to raise the issue in a posttrial motion cannot supply a basis for relief. Allowing the defendant to recast a waived pretrial claim as ineffective assistance based on the absence of a posttrial motion would permit use of the speedy-trial statute as a sword rather than the shield contemplated by section 103-5(a). *Cordell*, 223 Ill. 2d at 390. Accordingly, because the underlying statutory speedy-trial claim was waived and could not have resulted in dismissal, counsel's failure to include the issue in a posttrial motion was not deficient or prejudicial. *People v. Williams*, 2024 IL 127304, ¶ 22 (counsel is not ineffective for failing to raise a meritless argument). Because defendant cannot establish either deficient performance or prejudice under *Strickland*, his claim of ineffective assistance of counsel fails.

¶ 48　　Additionally, because the claim is predicated on alleged failures to preserve the statutory speedy-trial claim, we need not evaluate whether the State exercised due diligence in obtaining DNA testing under the principles outlined in *People v. Battles*, 311 Ill. App. 3d 991 (2000). *Battles* is concerned with the circumstances under which the State may justify a continuance, not with the defendant's procedural obligation to preserve a statutory speedy-trial claim.

¶ 49　　　　　　　　　　C. Improper Remarks During Closing

¶ 50　　Lastly, defendant argues that two errors occurred during the closing arguments. The first was that the State improperly shifted the burden of proof by highlighting defendant's failure to present any exculpatory evidence. The second was that the State improperly argued facts not in evidence. Defendant acknowledges that these issues were not properly preserved by failing to raise them before the trial court. Still, he seeks review under the plain error doctrine and, alternatively,

16

as an ineffective assistance of counsel claim for failing to preserve the claims for appeal. We begin our analysis with an overview of the general principles of law applicable to this situation.

¶ 51 "A defendant arguing that reversal of his conviction is warranted on the basis of improper closing argument faces a difficult burden." *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48 (citing *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010)). "[R]eversal is only warranted if the improper remarks were a material factor in the jury's verdict." *Id.* While it may be challenging to reverse a conviction based on an improper closing argument, it is possible if the "improper arguments are prejudicial enough to undermine a defendant's substantial rights." *Id.* (citing *People v. Brooks*, 345 Ill. App. 3d 945, 953 (2004)). In closing argument, prosecutors are allowed wide latitude and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000). However, prosecutors are not allowed to "engage in argument that serves no purpose other [than] to inflame the passions of the jury." *Holmon*, 2019 IL App (5th) 160207, ¶ 51 (citing *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)). On appeal, a closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *Id.*

¶ 52 In this case, defense counsel failed to object at trial to the prosecutorial statements made during the closing argument and further failed to raise this issue in a posttrial motion. Thus, defendant has forfeited review of those claims unless we consider them under the plain error doctrine. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 44.

> "Under the Illinois plain-error doctrine, a reviewing court may consider a forfeited claim when:

17

'(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Theis*, 2011 IL App (2d) 091080, ¶ 30 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

¶ 53                                          1. *Burden Shifting*

¶ 54    First, we address the argument that the State shifted the burden of proof by arguing in its closing that there was no other evidence presented explaining "any other cause of [Penny's] injuries." Defendant contends that the State's comments were to suggest that defendant could provide an alternative explanation as to the cause of the injuries. However, a prosecutor is allowed to argue facts and legitimate inferences drawn from the evidence. *People v. Williams*, 2023 IL App (1st) 192463, ¶ 134. Here, a reasonable inference from the evidence is that a gun being fired was the cause of Penny's injuries. Thus, we find the State's argument was to establish that Penny was shot by a gun and this was the only plausible explanation for Penny's injuries.

¶ 55    Next, we address the State's rebuttal when it argued that the jury received "absolutely no evidence in this case about anybody other than those three people there that night." Before the State's rebuttal, defense counsel made the following remarks in his closing argument: "there was not any other evidence identifying the shooter than two people that indicate that [defendant] is the shooter," and "are we left with only having to solely rely upon the word of two individuals?" Here, we find that the State's comment was in direct response to defendant's closing argument, where

defense counsel highlighted that the State's evidence consisted of only two eyewitnesses who identified defendant as the shooter. Thus, we find defendant's argument without merit where the prosecutor's remarks in rebuttal were invited by defense counsel's argument. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 56 ("Statements [made in closing argument] will not be held improper if they were provoked or invited by the defense counsel's argument." (Internal quotation marks omitted.)). Therefore, we find that the State's comments during its closing were reasonable inferences drawn from the evidence or were direct acknowledgments of defense counsel's argument.

¶ 56                              2. *Facts Not in Evidence*

¶ 57    Defendant also claims that the State improperly argued facts that were not in evidence. While a prosecutor may argue facts and legitimate inferences drawn from the evidence presented, it is improper for a prosecutor to argue assumptions or facts not based upon the evidence in the record. *Williams*, 2023 IL App (1st) 192463, ¶ 134. Specifically, the defense argues that it was improper for the State to theorize about a motive for the shooting during its rebuttal argument, when the State said:

> "[A]s to motive I would note that if you look at the tattoo that Ms. Baker saw on his back, it does refer to the 400 hundred block—or 4000 block, I submit that that's a reference to a block in Chicago, and I submit that that's perfectly consistent with her account that they were arguing, or arguing because she didn't—he didn't believe that she had, I guess, street credibility."

¶ 58    However, again, we find the State's comments were in direct response to defendant's closing argument. In closing, defense counsel argued:

19

"I don't believe [the State] really touched upon it in his initial closing argument. Perhaps he will when he gets up again, but you know, in opening statements and during some of the testimony a big to-do was made out of motive, you know, the notion was that my client belongs to some kind of biker organization, and Ms. Baker belongs to some biker organization, and that that was the motive here. Well, you heard Mr. Penny testify, and you know, I—I think the way his testimony came out is if there was a beef, it was just [defendant] didn't believe that Ms. Baker was involved in any kind of motorcycle club at all, not that this was a rival motorcycle club dispute or anything like that."

¶ 59    Thus, we find that the State's comments during its rebuttal were a direct acknowledgment of defense counsel's arguments during closing and were proper. Defendant also argued that the State improperly made assertions about the effects of trauma on one's memory without presenting any evidence at trial. During closing arguments, the State said to the jury:

"I would candidly submit to you that none of us, I hope, in our everyday experience in life have any idea of what she went through that day. We like to think our brains are like cameras. We like to think that you hit play and it just comes back verbatim the way it was, and that's not how trauma works. That's not how the brain works. Trauma upsets the way we order our memories, it upsets our processing of them. When we're in fight-or-flight mode, we have no control over what we focus on. It's only when we can reflect back on it that the pieces start coming back into place, and that's what happened here."

¶ 60    While defendant argues that the State made these assertions without presenting evidence, we find that this information was addressed in Officer Petrilli's testimony. During Officer Petrilli's testimony, she stated that it is not unusual for officers to get more information from witnesses involved in traumatic incidents as a case proceeds. Thus, the State's comments about the effects

20

of trauma on an individual's memory were based on uncontested testimony during the trial. As explained above, when reviewing statements made in closing arguments, we keep in mind that prosecutors are allowed wide latitude and may argue facts and reasonable inferences drawn from the evidence. *Williams*, 192 Ill. 2d at 573. Additionally, the closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *Glasper*, 234 Ill. 2d at 204. We find that the prosecutor's remarks were not improper because they were reasonable inferences from the evidence at trial or were in direct response to defense counsel's argument during his closing. Thus, because we find no "clear or obvious error" occurred, plain error review is inapplicable. *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 61 Alternatively, defendant argues that defense counsel was ineffective for failing to preserve these issues on appeal by failing to raise them before the trial court. Because we find no error, we decline to consider defendant's claim of ineffective assistance of counsel. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47.

¶ 62                                III. CONCLUSION

¶ 63 For the foregoing reasons, we affirm defendant's convictions.

¶ 64 Affirmed.